JeRoyd **GREENE** et al., Plaintiffs,

v.

**HOWARD UNIVERSITY**, Defendant.

Nathan **HARE**, Plaintiff,

v.

**HOWARD UNIVERSITY**, Defendant.

Civ. A. Nos. 1949–67, 2037–67.

United States District Court
District of Columbia.

Aug. 28, 1967.

Michael Nussbaum, Washington, D. C., for plaintiffs Greene and others.

Richard M. Millman, Washington, D. C., for plaintiff Hare.

George E. C. Hayes, Washington, D. C., for defendant.

## OPINION

HOLTZOFF, District Judge.

The primary question presented in these consolidated cases is whether the relations between a University and its students, and between a University and its faculty, are subject to judicial control; specifically, whether the termination by a University of the status of a student, or of a member of the faculty, is subject in whole or in part to judicial review.

The defendant in these cases is Howard University an institution of higher learning located in Washington, D. C. The plaintiffs may be divided into two classes. Some of them are students, whose status was terminated by the University as of the close of the academic year ending June 30, 1967. Others are members of the faculty, who held temporary appointments for a specific period only, and whose appointments the University declined to renew. This action is brought to require the University to restore the plaintiffs to their former status. The matter is before the Court at this time on motions for a preliminary injunction to reinstate the plaintiffs pending the trial of this action.

In view of the disposition of the issues about to be made by this Court, it would be superfluous to review in detail the incidents that led to the action taken by the University against the plaintiffs. Suffice it to say that it arose out of a series of disorders that took place on the campus of Howard University. In one instance, the head of the Selective Service System of the United States had

been invited to make a speech at the University. A group of students created such a disturbance as made it impossible for him to address the audience. At another time the University authorities were about to conduct a hearing on charges of misconduct against a student. A group composed of some students and of some members of the faculty created such a commotion and uproar as to render it impracticable for the hearing to proceed. Threatening utterances were heard on the campus. Several fires took place. The University authorities concluded, after a careful and thorough investigation, that the student plaintiffs, as well as those plaintiffs who were members of the faculty, actively participated in creating these chaotic conditions and disorder. Accordingly, in an effort to bar a continuation and repetition of such disruptive incidents, the University in June 1967, sent a formal letter to each of the student plaintiffs, notifying him that he would not be permitted to return to the institution for the next academic year. The other plaintiffs were instructors, or junior professors, who had only temporary appointments without any permanent tenure. If such appointments were not renewed, their connection with the faculty would be automatically terminated at the expiration of the academic year. The University, again in June 1967, sent a letter to each of this group of plaintiffs formally notifying him that his appointment, which was about to expire on June 30, 1967, would not be renewed.

As the questions of law relating to the two types of plaintiffs are somewhat different, we shall deal with each category separately. We shall first consider the student plaintiffs. Their complaint is predicated on the contention that they were not accorded their alleged Constitutional right to receive notices of charges and a hearing, but were dismissed from the University by *ex parte* decisions. The relief that they seek is to require the University to vacate its action and to give them notices of charges and a hearing.

■■ This contention is based on a misconception of the scope of the Bill of Rights. The procedural safeguards and the privileges accorded by the Constitution of the United States are confined solely to judicial and quasi-judicial proceedings, either in the courts or before administrative agencies. They are directed solely against Governmental action.[1] They do not extend to any other relation in life, such as that of parent and child, teacher and pupil, or employer and employee. These relations are of a private character. While some of them, such as that of employer and employee, may be circumscribed by contract or by statute, they are not controlled by the Constitution. For example, until the enactment of the Civil Service laws, the Federal Government had the right to discharge any of its employees at will. In fact, it may do so even now in respect to those persons who are exempt from the various limitations of the Civil Service statutes.[2] To take another example, arbitrary discharge of employees of private concerns may be limited by statute or by agreements between the employers and labor unions, but Constitutional restrictions are not applicable.

1. See in this connection Parsons College v. North Central Ass'n of Colleges and Secondary Schools (N.D.Ill. July 26, 1967) 271 F.Supp. 65.

2. When President Andrew Jackson took office, he summarily caused the discharge of numerous Government employees in order to appoint his own followers to the positions so vacated, on the theory, as expressed by one of his contemporaries, that "To the victor belong the spoils". While this action may have been a bar sinister on his escutcheon, it did not constitute a violation of any Constitutional or statutory rights, because there were none. It was not until many years later that Civil Service laws were enacted to protect the tenure of certain Government employees.

Counsel for the plaintiffs rely principally on the decision of the Court of Appeals for the Fifth Circuit in Dixon v. Alabama State Board of Education, 294 F.2d 150, which held by a vote of 2 to 1, that a State College had no authority to expel a student without first giving him notice and some opportunity for a hearing. The Court referred to the State college as "a governmental body". Counsel for the student plaintiffs in the case at bar argued that there are sufficient contacts and a strong enough connection between Howard University and the Federal Government to render the principle of the *Dixon* case applicable. Decisions of Courts of Appeals of other circuits must be regarded with respect and may be persuasive, but they are not necessarily controlling. For the reasons about to be stated, it is not necessary, however, to determine whether the principle evolved by the *Dixon* case, should constitute the law in the District of Columbia.

Unlike the college involved in the *Dixon* case, Howard University is not a governmental body. It is a private corporation created by an Act of Congress. True, a large percentage of its expenses are paid by annual appropriations made by Congress. As a condition of receiving such money, the Secretary of Health, Education and Welfare is given authority to visit and inspect Howard University and to control and supervise the expenditures of those funds which have been appropriated by Congress, 20 U.S.C. § 122. In addition, the President and Directors of Howard University are required to file an annual report with the Secretary. No Government officer, however, is a member of the Board of Trustees of the Institution, nor is any control over the institution vested in the Federal Government.

The status of Howard University is not open for determination by this Court, for it has already been held by the Court of Appeals for this Circuit that the University is a private corpora-

tion and is not a public institution, Maiatico Const. Co. v. United States, 65 App. D.C. 62, 79 F.2d 418. Speaking for a unanimous bench, Groner, J., in that case wrote as follows:

> Howard University is a private corporation. It was incorporated under an act passed March 2, 1867 (14 Stat. 438), and its charter gives it all the rights and powers usually vested in private corporations, including the right to purchase and sell real estate, and the right to contract and to sue and to be sued.

Judge Groner then referred to the fact that in 1928, a statute was enacted enabling Congress to make annual appropriations for the support of the University. Judge Groner continued:

> This amendment of the charter of the university goes no farther than its terms. If it successfully legalizes the appropriation out of the Treasury of money of the government in aid of a private institution, it does not, nor does it purport to, change the fundamental character of the institution or make it any the less private; for Congress has passed no law giving the Secretary of the Interior or any other officer of the government control of the university, and we think it is obvious it could not do so without the consent and approval of the corporate authorities of that institution. Hence, in the view we take, the generosity of the government is not enough in itself to change a private into a public institution.

The *Maiatico* case was cited with approval and its doctrine reaffirmed and applied in Irwin v. United States, 74 App.D.C. 296, 122 F.2d 73. It is clear, therefore, that the principle which counsel for the plaintiffs seek to invoke, namely, that a Government college or university may not expel its students without notice of charges and an opportunity to be heard, is not applicable to Howard University, for it is not a public

institution nor does it partake of any governmental character.

It would be a dangerous doctrine to permit the Government to interpose any degree of control over an institution of higher learning, merely because it extends financial assistance to it. There are numerous colleges in this country, whose establishment was made financially possible by grants of land by the Federal Government. It is inconceivable that for this reason every "land grant college", as such institutions are generally denominated, should to some degree be subject to the control of the Federal Government, or that the Federal courts should be empowered to interfere with the administration of discipline, or the appointment of members of the faculty in such schools. In recent years, numerous universities, colleges and technical schools have received Governmental aid of various kinds by being granted funds to carry on scientific research projects. Surely it should not be held that any institution by entering into a contract with the United States for the conduct of some project of this sort and receiving funds for that purpose, has placed its head in a noose and subjected itself to some degree of control by the Federal Government. Such a result would be intolerable, for it would tend to hinder and control the progress of higher learning and scientific research. Higher education can flourish only in an atmosphere of freedom, untrammelled by Governmental influence in any degree. The courts may not interject themselves into the midst of matters of school discipline. Such discipline cannot be administered successfully in the same manner as governs the trial of a criminal case or a hearing before an administrative agency.

Students entering Howard University are formally advised by the University authorities that attendance at the institution is not a right but a privilege. In that important respect, among many others, Howard University differs from some State colleges. It is further indicated that this privilege may be withdrawn by the authorities if in their own judgment a student, who has been accepted for admission, does not conform to standards of conduct that the University exacts from its student body. Nowhere is it stated directly or by implication that a student would be accorded a hearing before his connection with the University could be terminated.

The University catalog, which is available to all prospective students and to members of the student body, as well as to the general public, enunciates the relation between the University and its students as follows:

Attendance at Howard University is a privilege. In order to protect its standards of scholarship and character, the University reserves the right, and the student concedes to the University the right, to deny admission to and to require the withdrawal of any student at any time for any reason deemed sufficient to the University. Admission to and enrollment in the University include obligations in regard to conduct, both inside and outside the classroom, and students are expected to conduct themselves in such a manner as to be a credit both to themselves and to the University. They are amenable to the laws governing the community as well as to the rules and orders of the University and University officials, and are expected to conform to the standards of conduct approved by the University.

In this important respect, among many others, Howard University differs from some State institutions to which all qualified residents of the State are entitled to be admitted. As indicated in its catalog, this is not the case at Howard University, which partakes of the character of a private institution. If there is any contractual relation between the University and its students, the foregoing provisions are part of the contract.

■ The conclusion necessarily follows that the student plaintiffs had no constitutional, statutory, or contractual right to a notice of charges and a hearing before they could be expelled or their connection with the University could be otherwise severed. It was entirely within the discretion of the University authorities to grant or withhold a hearing. Consequently, the student plaintiffs are not entitled to any relief requiring the University to reinstate them until they have received a notice of charges and a hearing.

The issues relating to those plaintiffs who were members of the faculty are somewhat different. The faculty plaintiffs were instructors or junior professors, who had no permanent appointments or indefinite tenure. Each of them held an appointment for a temporary period. Appointments of this type are frequently renewed, but by the same token, the renewal could be denied. In this instance the appointments of the faculty plaintiffs were not renewed as of the end of the academic year ending June 30, 1967. They were so notified prior to the expiration date. In following this course the University was entirely within its legal rights.

■ It is claimed in behalf of plaintiffs in this category, however, that under what are asserted to be regulations of the University, they were entitled to notice prior to specified dates that their appointments would not be renewed, and that failure to give such notice, required the University to renew the appointments. This contention is lacking in merit.

The Faculty Handbook of Howard University, which embodies regulations affecting members of the faculty and which is available to all of them, contains the following significant provision in regard to a renewal of term appointments in Section V, paragraph B, p. 19:

The University shall be under no obligation to renew term appointments and therefore holders of academic positions under term appointments should have neither presumption of permanence nor expectancy of automatic reappointment.

Counsel for the faculty plaintiffs relies on Section IX of the same Handbook, page 22, which reads as follows:

Notice of Non-reappointment and Reappointment: It will be the practice of the University, *without contractual obligation to do so,* to give written notice at the following times to officers of instruction whose services are no longer required: A) Deans will give notice each year to those whose terms expire and whom they do not propose to recommend for reappointment, not later than December 15 of that year; B) The Board of Trustees will give notice to those teachers whose terms expire and whose services are no longer required, directly following its meeting in January of each year. [Emphasis supplied.]

It is contended by counsel that Section IX constitutes an obligation to give notice of an intention not to renew a term appointment not later than a specified date, and in case of failure to give such a notice, the appointment must be deemed renewed. To construe Section IX in this manner would do violence to its very language. That regulation provides that it will be the practice of the University *without contractual obligation to do so,* to give written notice prior to specified dates. Section IX and Section V must be read together. Instructors and professors holding term appointments are expressly warned that there is no obligation to renew term appointments and holders of such positions should have neither presumption of permanence nor expectancy of automatic reappointment. While Section IX sets forth a practice of giving advance notice of intention not to reappoint, it is expressly provided that there is no contractual obligation to do so. It is entirely conceivable that a situation may arise subsequently to the specified

date that would lead the University not to renew a term appointment. Such were the circumstances in this instance.

The conclusion is inescapable that the faculty plaintiffs were not entitled to a renewal of their appointments as a matter of law, and that the University had a legal right not to reappoint them. Complete discretion in the matter is vested in the University authorities.

■ Even if there were a contractual obligation of some type, that circumstance would not entitle these plaintiffs to equitable relief. At most it might give rise to an action for damages. A contract to hire a teacher may not be enforced by specific performance. It is not within those few categories of agreements that are enforceable in equity. It would be intolerable for the courts to interject themselves and to require an educational institution to hire or to maintain on its staff a professor or instructor whom it deemed undesirable and did not wish to employ. For the courts to impose such a requirement would be an interference with the operation of institutions of higher learning contrary to established principles of law and to the best traditions of education.

The intellectual history of Western Europe and the United States is marked by the establishment and gradual growth of universities that are self-governing, in the selection of their faculties, in prescribing their curriculum, and in administering discipline of their student bodies. This history demonstrates that centers of higher learning can best develop and flourish in an atmosphere of liberty and independence, where they are free from governmental influence in any respect as to any aspect of their activities. A glance at this history is convincing. Universities in Italy, such as Bologna;[3] universities in France, such as Paris;[4] and Universities of Oxford and Cambridge in England,[5] all of which originated in the Middle Ages, were from their very inception and always have remained independent bodies, unfettered by any intrusion on the part of any governmental agency, or of the courts. In this country with the early establishment of Harvard, William and Mary, Yale, Princeton and King's College (later Columbia), this tradition was continued and has prevailed. Such institutions have been free of governmental control. One attempt to the contrary was defeated by the decision of the Supreme Court in the *Dartmouth College* case,[6] in which the college was eloquently and forceably represented by Daniel Webster as counsel. Fortunately, even State universities in this country, which came later, particularly the larger institutions, have been left singularly free of governmental control or interference.

It would be a sad blow to institutions of higher learning and to the development of independent thought and culture if the courts were to step in and control and direct the administration of discipline and the selection of members of the faculty in universities and colleges. An entering wedge seemingly innocuous at first blush, may lead step-by-step to a serious external domination of universities and colleges and a consequent damper and hindrance to their intellectual development and growth.

In the light of the foregoing considerations, the motions for a preliminary injunction are denied.

This opinion will constitute findings of fact and conclusions of law.

3. Rashdall—The Universities of Europe in the Middle Ages, Vol. I, pp. 151 et seq., 176 et seq.

4. Id. pp. 298–320, 398–432.

5. Id. Vol. III, pp. 55 et seq., 92 et seq., 279–292.

6. Trustees of Dartmouth College v. Woodward, 4 Wheat. 518, 4 L.Ed. 629.