129 N.J. Super. 249 (1974)
322 A.2d 846
AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, BLOOMFIELD COLLEGE CHAPTER, AND EDWARD F. ROBINSON, T. ROBERT BASSETT, ROBERT W. NICHOLS, ELLA F. HANDEN, HOWARD A. FARRANDS, JOHN R. FURTNEY, HAROLD L. KRUSE, JR., DEE HENOCH, B.W.Y. SNAPP, DAVID R. SHERMAN, RAYMOND K. VALADEZ AND SALVATORE IANNELLI, INDIVIDUALLY, AND ON BEHALF OF THE FACULTY AT BLOOMFIELD COLLEGE, PLAINTIFFS,
v.
BLOOMFIELD COLLEGE, A LICENSED INSTITUTION OF HIGHER EDUCATION OF THE STATE OF NEW JERSEY, MERLE F. ALLSHOUSE, AS PRESIDENT OF BLOOMFIELD COLLEGE, AND INDIVIDUALLY, AND C. RICHARD CARLSON, RICHARD CRAVEN, WILLIAM E. HENDRICKS, HOWELL H. HOPSON, HAYDN R. JONES, W. EDMOND CARVER, C. WILLARD HECKEL, WILLIAM LOWERY, EVELYN RUNG, RUTH SULC, WILLIAM S. ACKERMAN, VERA BARTH, CHARLES L. BERTINI, MELVIN R. CAMPBELL, MARTIN A. CLIFTON, THOMAS W. CROOK, J. ROBERT HILLIER, ANDREW A. McELWEE, JAMES M. RICE, CHARLES F. ROBBINS, JR., DONALD H. SCOTT, ROBERT H. STEPHENS, RICHARD C. VIGEANT, FRANK A. DELMONICO, C. FRANK KIREKER, JR., G. GORDON M. LARGE, PAUL W. NORDT, JR., JAMES W. WRIGHT, AND WILLIAM F. ZICK, AS MEMBERS OF THE BOARD OF TRUSTEES OF BLOOMFIELD COLLEGE, AND INDIVIDUALLY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 26, 1974.
*251 Mr. William S. Greenberg for plaintiffs (Messrs. Sterns & Greenberg, attorneys).
Mr. Clyde A. Szuch for defendants (Messrs. Pitney, Hardin & Kipp, attorneys).
*252 ANTELL, J.S.C.
This is an action for declaratory relief and specific performance with respect to the academic tenure of faculty members at Bloomfield College, a private institution of higher education licensed under the laws of the State of New Jersey. Plaintiff American Association of University Professors, Bloomfield College Chapter (hereinafter AAUP), is a labor organization within the meaning of the National Labor Relations Act, 29 U.S.C.A., § 152, and for the purposes of Article I, paragraph 19 of the 1947 New Jersey Constitution, which has been certified and recognized by the National Labor Relations Board as the exclusive representative for collective bargaining on behalf of the college faculty. The individual plaintiffs include faculty members who seek clarification of their claimed tenured status and those whose service has been terminated and seek reinstatement to their former positions. Their periods of accumulated service range from 8 to 22 years. In addition to Bloomfield College, also named as defendants are Merle F. Allshouse, president of the college, and the individual members of the college board of trustees.
The legal basis of plaintiffs' claim of tenure is to be found in the Faculty Handbook of the college under the heading of "Bloomfield College Policies on Employment and Tenure" (hereinafter "Policies"). This document forms an essential part of the contractual terms governing the relationship between the college and the faculty. Hillis v. Meister, 82 N.M. 474, 483 P.2d 1314 (Ct. App. 1971); Greene v. Howard University, 134 U.S. App. D.C. 81, 412 F.2d 1128 (1969); Mendez v. Trustees of Boston University, 285 N.E.2d 446 (Mass. Sup. Jud. Ct. 1972). Under paragraph C thereof
Bloomfield College recognizes that tenure is a means to certain ends, specifically: (1) freedom of teaching and research and of extra-mural activities, and (2) a sufficient degree of economic security to make the profession attractive to men and women of ability. Freedom and security, hence tenure, are indispensable to the success of an institution in fulfilling its obligations to its students and to society. *253 Following a probationary period of seven years, which has been completed by all the individual plaintiffs, subparagraph C(3) provides:
* * * a teacher will have tenure and his services may be terminated only for adequate cause, except in case of retirement for age, or under extraordinary circumstances because of financial exigency of the institution.
Pertinent also is subparagraph C(6) of the "Policies" which provides:
Termination of continuous appointment because of financial exigency of the institution must be demonstrably bona fide. A situation which makes drastic retrenchment of this sort necessary precludes expansion of the staff at other points at the same time, except in extraordinary circumstances.
On June 21, 1973 the board of trustees adopted Resolution R-58 which in material part resolved:
* * * [U]pon the recommendation of the Executive Committee, the President, the Dean of the College, and with the advice of the special Evaluation Committee for the reduction of faculty size due to financial exigency, and in accordance with the action of the Board on March 1 and the recommendation of the Academic Affairs Committee that thirteen faculty members be terminated in the reduction of faculty size due to financial exigency, the following persons be informed that they will be terminated as of June 30, 1974, and their duties for the 1973-74 academic year be defined to include no teaching, participation in College governance, or voting privileges. * * *

* * * * * * * *
That every faculty member be informed on or before June 30, 1973 that all 1973-74 contracts are one-year terminal contracts. The Board of Trustees through its Academic Affairs Committee will call together from among the remaining 54 members of the faculty an evaluation committee to determine what faculty members will remain at the College beyond June 30, 1974. This Committee to Define and Evaluate Personnel Needs will define personnel needs for the new academic program priorities which are set and the curricular revisions which are made, and will evaluate existing faculty members to determine their qualifications for meeting these needs. Their recommendations are to be made no later than November 30, 1973. All faculty members will be notified by December 15, 1973, as to their contract status for the 1974-75 academic year.
*254 Acting thereunder, defendant Allshouse under date of June 29, 1973 notified 13 members of the faculty that it was his "unpleasant duty to inform you that the Board of Directors, at its meeting on June 21, 1973, took action to terminate your services as part of the reduction of the faculty size due to financial exigency." They were further advised:
Following the Board's action and in accordance with our prior oral conversation, this will serve to advise you formally that you have been relieved of all duties as a Bloomfield College faculty member; and, therefore, you will not be obliged to and will not perform any services for the College or participate in College governance after June 30, 1973.
The letter expresses the hope that the recipient
* * * understand the need for the College to take stern measures in a time of financial exigency despite the personal disappointment and anguish which are inevitably part of such a decision. You have made an invaluable contribution to the College, and I deeply regret that our present situation makes this action necessary.
On the same date all the remaining members of the faculty, tenured and nontenured, were notified by letter memorandum that at the June 21 meeting the board of trustees "took action to the effect that every faculty member should be informed that all 1973-74 contracts are one-year terminal contracts." The letter continues:
The notice of termination does not necessarily imply that you will be terminated at the end of the 1973-74 academic year, but it provides a base from which each faculty member can negotiate a learning contract which meets both personal professional interests and College needs.
During the period between June 21, 1973 and the commencement of the school year in September 1973 the College engaged the services of 12 new and untenured teachers to serve on its faculty. Defendants assert that these were hired to replace others who were lost to the school over a *255 period of time as the result of "normal attrition," not those who were terminated under Resolution R-58.
Among the roster of plaintiffs are included (1) those faculty members who received termination notices and seek reinstatement to their former positions, and (2) those whose employment was continued, but subject to one-year terminal contracts. The latter ask declaratory judgment that their tenured status is unaffected by the action of the board of trustees in adopting Resolution R-58. As is clearly implied by the excerpted documents, defendants justify the resolution on the basis of "financial exigency." The issue projected is whether the action accomplished by Resolution R-58 in abrogating tenure and terminating the employment of tenured faculty members at Bloomfield College was "demonstrably bona fide" as having been taken "under extraordinary circumstances because of the financial exigency of the institution." Complementary thereto is the question as to whether the circumstances were further "extraordinary" so as to allow at the same time for the hiring of 12 new teachers.
Bloomfield College is a small commuter-type institution tracing its origins to an academy founded in 1807 by the Presbyterian Church. It was established as the German Theological School in 1868 and is affiliated with the New Jersey Synod of the United Presbyterian Church. It serves a student body which has been described as ethnically mixed, presenting a low academic profile and embracing a large minority group representation. Students are drawn mainly from the lower middle and upper lower economic strata and for the most part are enrolled in the school's business and nursing departments.
Present annual tuition is $2,000, up from $1,330 in 1969. Enrollment for the present year, 1973-74, is 867, down from 1,069 in 1972. The portent of these figures lies in the fact that three-fourths of the school's financial support is derived from enrollment income.
*256 Enrollment projections testimonially offered by college officials for 1974-75 range betwen 450 and 638. These were given without factual foundation and are said to have been based upon unspecified "demographic studies." They are in curious contrast to the projected enrollment of 905 for the same period, gradually increasing to 1,030 during the school year 1978-79, which appears at page 17 of the Bloomfield College President's Report dated March 1974. The discrepancy is rationalized by President Allshouse's explanation in part that to publish the bleak truth in his report would have disserved the interest of public relations and been damaging to college morale. Although in final form, it has been decided to withhold the report from public distribution for reasons of economy, not because of any errors in its content.
Although the decreased enrollment for the 1973-74 year was accurately forecast in the spring of 1973, the previous year's projection fell short of the actual enrollment by 131 students. This miscalculation was never explained, and is noted with interest for the reason that the faculty reduction from 76 to 54 was deliberately brought about to achieve, supposedly, a 17 to 1 student-faculty ratio based upon anticipated enrollment for the 1973-74 school year. That this decision rested upon data of demonstrated unreliability is pertinent to a determination as to the college's good faith.
The reduction referred to was the combined result of discharging the 13 teachers, "normal attrition" to the extent of 21 teachers who left for various reasons between June 30, 1972 and August 31, 1973, and addition of the 12 newcomers between June 21 and September 30, 1973. Consideration was given to retaining the discharged faculty members instead of hiring new ones, but this alternative was rejected upon the belief, it is said, that the former would not fit in with proposed program innovations which were envisioned by the college as part of its overall rehabilitation. The changes were described in the evidence as "new directions," *257 and were planned to set the college on a unique academic course. Their design was to reduce the number of majors and departments by bringing them all into 12 broad interdisciplinary areas in order to improve administration and curricular planning. The ultimate objective, so it was said, was to turn around the enrollment projections by (1) offering career oriented prospective students a firm liberal arts foundation, (2) enhancing the distinctiveness of attending Bloomfield for what it could offer as a small college, and (3) responding "very seriously" to the personal needs of the students.
Apart from the installation of a special freshman seminar and advisory program and greater emphasis on the development of evening and part-time enrollment of mature women and special groups, and possibly the improvement of administrative controls, the practical changes to be accomplished by the new directions were never clearly stated. Despite the references to interdisciplinary approaches, the basic disciplines still prevail, and whatever revisions may have been made are minor in nature. Notable also on the question of bona fides is the fact that the decision to install the new directions was not made until the fall of 1973, some months after the adoption of Resolution R-58 and after the institution of plaintiffs' suit. In any event, the results assertedly anticipated by the new programs are not now seen as attainable. Present projections forecast continued reductions in enrollment.
Turning to a consideration of the college's assets and liabilities, we note first that its budget for the 1972-73 school year was $3,652,000. For the year 1973-74 it is $3,397,000. The planned cash deficit for 1972 was $123,000 and for 1973 $191,000, with estimates that it will probably rise to $231,000 for the year. Between June 30, 1973 and March 31, 1974 it reached $145,000. By cash deficit is meant the amount by which the accounts payable and direct loans exceed available cash. In June 1973 its operating deficit, i.e., the amount by *258 which current liabilities exceed current assets, was $368,000. In 1973 the college endowment fund was $945,000, reflecting a 21% decline from the previous year, of which 17.19% occurred between January 1 and March 31, 1973. Cash flow problems intensified around June 1973, with accounts payable accumulating to the point where some went back to February 1973, and were compounded by financing difficulties. Interest on loans rose from 8% to 11%, higher borrowing costs resulted from the college's loss of status as a prime lending risk some years ago, and the declining value of the endowment portfolio further restricted borrowing capacity. As the result of conferences  which were, coincidentally, carried on during the hearings and of which the court was kept aware  its bank will now determine its lending status on a week-to-week basis and will advance no funds other than those necessary to meet payrolls. Under these circumstances a freeze has been placed upon all expenses other than payroll.
It is recognized by the administration that existing mortgages could be recast in order to case the cash situation, but this decision has been deferred for the reason that the ultimate costs would eventually increase the financial burden. The prospect of rising fixed costs, the built-in limitation on tuitions resulting from the economic character of the student body, and reductions of federal aid with no corresponding increases in state aid programs are additional negative factors. Lack of available scholarship aid is another deterrent to the college's financial reanimation. At present it can only put 4% of its budget into scholarships, a figure which should be as high as 15% to 17%. Help is needed from federal or other outside sources, and without such assistance the school is burdened by a "tuition-subsidy gap." It is believed that enrollment and tuition income will continue to decline for the following three reasons: (1) the pool from which the college has historically drawn in terms of age and economic background is itself being diminished, a widespread phenomenon; (2) inability to develop a sufficiently attractive *259 academic program, and (3) costs. In addition, it is believed that the present location of the college in Essex County is not conducive to further growth for the reason that the area is already overburdened with educational facilities in terms of existing need.
The remaining significant asset of the college, in addition to its tuition income, the college property and its endowment fund, is the Knoll Golf Club. The Knoll is a property of 322 acres, having two golf courses, two club houses, a swimming pool and a few residences. It was purchased by the college around the end of 1966 or early 1967 with the intention of using it for the establishment of an educational plant. The purchase price was $3,325,000 and was paid for by $900,000 cash, a bank loan of $300,000 and a mortgage of $2,125,000. The $900,000 was provided as a gift to the college by the Presbyterian Church out of monies raised as part of its Fifty Million Dollar Fund, a fund-raising project conducted by the church. These monies are dedicated to purposes of educational capital development and cannot be used for any other purpose.
Conservative estimates as to the market value of The Knoll in its present condition lie between $5,000,000 and $7,000,000. The net yield to the college out of a $5,000,000 sale, after taxes and the liquidation of secured debts, would be around $1,536,000. At $7,000,000 the sale would yield $2,366,000. In addition, there would also be realized some $795,000 owing to the college's current operating fund as well as approximately $727,000, being the present value of the gift from the Fifty Million Dollar Fund, subject, of course, to the terms and restrictions of that benefaction.
Although the college does not carry The Knoll as a liability, the income received therefrom does not exceed what is necessary to meet carrying charges. It is required, however, to make substantial cash advances during the year to sustain the operation, and these, of course, are additional burdens upon its already strained cash position. At year's end 1972 *260 and 1973 these advances totaled $263,000 and $269,000, respectively.
The salient economic features of this property in its present posture, therefore, are that it is altogether lacking in income-producing characteristics, that it compels some degree of cash diversion from the operating needs of the college, and that its sale would release sufficient cash to meet the college's immediate and reasonably foreseeable financial requirements.
Present plans for the future of the Knoll are uncertain. The one being most seriously entertained is the installation of a large development which would occupy 202.5 acres of land. Site plans and proposals show an 84-month building plan projecting 61 units of low-density housing, 240 units of luxury housing, 2 medium-rise buildings having 340 units, as well as medium-density townhouses and condominiums. Negotiations preliminary to necessary zoning applications are taking place, but even assuming zoning approval is obtained (a prospect which is by no means assured), a lead time of at least two years must precede actual construction. Needless to say, the successful completion of such a program would greatly enhance the value of The Knoll to the college as a sustaining asset, but it is obvious that retention of the property for long-term appreciation necessarily requires that the college forego the benefit of the improved cash position which would be realized from a near term sale.
Without question, the economic health of the college is poor. A more definitive diagnosis is that the problem is chiefly one of liquidity, a difficulty with which the college has been coping for many years. Although a recent audit shows $56,000 in cash as against accounts payable of $301,000, previous years' figures show that in 1968 there was only $808 against $985,000 in accounts payable, in 1971 $6,000 available against $1,247,000 in accounts payable, in 1972 $6,000 available as against $777,000, and as of June 30, 1973 $12,302 available as against $1,018,000. The college's dilemma is real, but not unique. Although financially beleaguered, *261 as Mr. Ritterskamp, who testified on behalf of the college as an expert in the financing of higher education, said, "all private education is in financial trouble today."
Notwithstanding the problem of cash flow, Bloomfield College is a very substantial educational institution with a net worth of $6,600,000, reflecting assets of $12,600,000 and liabilities of $6,000,000, based upon book values which show The Knoll as an asset worth only $3,370,000. The college is by no means insolvent, even though it is difficult for it to meet obligations as they mature. Although its preference is to exploit The Knoll's long-term possibilities, its choices are by no means restricted to this course of action. The option of selling the property now is perhaps more realistic as a survival measure since it would supply immediate liquidity. Near-term infusion of needed cash could start an economic recovery leading the college at some future time to a firmer financial base from which to move into more speculative, more rewarding ventures of the kind now under consideration. While the program of development being investigated might eventually provide vast financial resources, they would not begin to benefit the college for many years during which it would presumably continue its penurious standards to the detriment of its standing as an educational institution.
Regardless, however, of what the future may offer, the sale of The Knoll as an available alternative to the abrogation of tenure is a viable one and fairly to be considered on the meritorious issues.
Also to be noted are the facts concerning the accreditation of the college by the Middle States Association of Colleges and Secondary Schools, the regional accrediting body for educational institutions in New Jersey. In March 1970 the college was examined by the Association and only temporary accreditation granted for a two-year period to allow the Association to resolve its doubts concerning the college's finances and long-term prospects. During this interval the college filed annual plans, and full accreditation was finally *262 granted through 1975 when it is expected that a regular visit will be made and every aspect of the college reviewed. Until then its accreditation will remain intact and the college will have at least that much time to correct those factors which adversely affect its financial base.
Although the concept of academic tenure does not lend itself to perfect legal classification, its functional meaning within the present context is sufficiently clear for purposes of application. It is based upon principles identical to those recited in the historic 1940 "Statement of Principles" promulgated by the American Association of University Professors and endorsed at various times by 85 colleges and professional associations through the year 1973. That statement, in turn, finds its antecedents in the 1915 "Declaration of Principles" which was officially endorsed by the American Association of University Professors in December 1915, as well as the 1925 "Conference Statement on Academic Freedom and Tenure" which was endorsed by the Association of American Colleges in 1925 and by the American Association of University Professors in 1926. Byse & Joughin, Tenure in American Higher Education 171 et seq.
As recited in the Bloomfield College "Policies" and in the 1940 "Statement of Principles" "Tenure is a means to certain ends; specifically: (1) Freedom of teaching and research and of extra mural activities, and (2) A sufficient degreee of economic security to make the profession attractive to men and women of ability." Practice undoubtedly varies from one institution to another, but under the "Statement of Principles" and the "Policies," tenure does not "automatically" arise. It is conferred after the faculty member has passed through a probationary period during which his qualifications are examined by his peers and the administration. Thus, it is only after a demonstration of professional competence that the faculty member arrives at a status where he will be free of outside pressures and influences that might interfere with the conduct of his research, his interpretations and his investigations, or lead him to *263 compromise the search for truth in his discipline and in transmitting it to his students. Although academic tenure does not constitute a guarantee of life employment, i.e., tenured teachers may be released for "cause" or for reasons of the kind here involved, it denotes clearly defined limitations upon the institution's power to terminate the teacher's services.
The question of tenure in American education has never been free of controversy. The debate centers on whether it is a necessary or effective safeguard for the protection of academic freedom, and whether it advances or retards the progress of useful research and teaching within the educational establishment. Its defenders reply that the criticisms addressed to the tenure system relate more to abuses in practice rather than to the fundamental principles themselves. Byse & Joughin, supra; Davis, "Enforcing Academic Tenure: Reflections and Suggestions," 1961 Wis. L. Rev. 200; Van Alstyne, "Tenure, A Summary, Explanation, & Defense" 57 AAUP Bull. 331 (1971); Faculty Tenure, A Report and Recommendations by the Commission on Academic Tenure in Higher Education (The Jossey-Bass Series in Higher Education 1973); Note, "Academic Tenure: The Search for Standards," 39 So. Cal. L. Rev. 593 (1966); Brewster, "1971-72 Report of President of Yale University" (excerpt reprinted) 58 AAUP Bull. 381 (1972); Nisbet, "The Future of Tenure," Change (April 1973) at 27 et seq.; Machlup, "In Defense of Academic Tenure," 50 AAUP Bull, 112 (1964).
We take note thereof only in passing. The merits of the wider controversy do not concern us and will not be explored within the framework of the present proceeding. However the policy debate may ultimately be resolved in another forum, it is sufficient to observe that the concept is the product of historical experience and long debate. Its adoption is not merely a reflection of solicitude for the staffs of academic institutions, but of concern for the general welfare by providing for the benefits of uninhibited scholarship *264 and its free dissemination. The security provided therefor by the consensus of learned authority should not be indifferently regarded. It should be vigilantly protected by a court of equity except where, under agreed standards stringent to the point suggested by phrases such as "financial exigency," "drastic retrenchment," "extraordinary circumstances" and "demonstrably bona fide," the survival of the college is imperiled, and then only where the good faith of the administration in seeking the severance of tenured personnel has been clearly demonstrated as a measure reasonably calculated to preserve its existence as an academic institution. It is not a sufficient justification only that the college acted on the belief that the measure would in some degree advance the financial fortunes of the institution. Cases in which dismissals "for reasons of economy" or in response to decreased pupil enrollment were sustained are based upon specific statutory sanction for the action taken and are inapplicable.
A resolution of this controversy is not referable merely to the criterion of "financial exigency." Except for the fact that the 1925 "Conference Statement" recognized discharges for financial exigency "provided they were undertaken as a last resort," Metzger, "Academic Tenure in America: A Historical Essay," appearing in Faculty Tenure, A Report and Recommendations, supra at 93, 151, the term is highly relative and must be applied within a given context. Its applicable register of meaning is to be found somewhere between the understanding offered by the chairman of the college's board of trustees as "an urgent financial situation about which something had to be done in order to stay in business," and that propounded by the Princeton professor of economics who advocated that financial exigency exists "when, taking into account all assets, potential assets, sources of funding, income and all alternative courses of action, the continued viability of the institution becomes impossible without abrogating tenure."
*265 Conceding that the college is under financial stress, and that "something had to be done," it does not follow that the college's freedom of response extends to the unilateral revocation of a contractually protected employment status and the discharge of tenured teachers as a matter of unbridled discretion. Similarly, although it may be appropriate to inspect the available resources anl alternatives open to the college, this does not imply authority on the part of the court to substitute its judgment for that of the trustees, to weigh the wisdom of their action, to modify wayward or imprudent judgments in their formulation of educational or financial policy, or to decide whether the survival of the institution remains "possible" by the choice of other courses of action. The trustees, after all, have the best insight into the college's problems and will have the continuing duty of determining and providing for its future priorities. Their considered judgment in matters of policy is not lightly to be displaced. Interests must be balanced, and while the court must refrain from interfering with the policy-making and administrative processes of the college, still, it is called upon to protect important contractual rights against excesses in the mobilization of administrative and policy-making powers.
In the interpretation of a contract it is the primary function of the court to ascertain and effectuate the intention of the parties. The contract must be construed as a whole, and the intention of the parties is to be collected from the entire agreement, having regard to the language chosen, the relations of the parties, the attendant circumstances and the objective they were trying to attain. Fidelity Union Trust Co. v. Robert, 36 N.J. 561, 567 (1962); 4 Williston, Contracts (3 ed. 1961), § 601.
In our search for the controlling standard we are struck by the great plasticity of the raw material presented. The very concept of "exigency" changes before our eyes. Its meaning varies with the light of surrounding circumstances. To say that it connotes a state of pressing urgency, a time of *266 crisis or immediate need, is meaningless without knowing the nature of the particular need, its relationship to the purposes of the institution, and what will be sacrificed by its nonfulfillment. One must cross the long gradient between starvation and appetite, between illness and discontent, between need and desire, and determine where one ends and the other begins. It is a process which involves a sequence of changing value judgments based upon altering proportions between costs and objectives. In this sense, the only definition of exigency which suits our needs is that offered by Webster as "such need or necessity as belongs to the occasion." Webster's Third New International Dictionary of the English Language (1969).
That the parties intended that this evaluation not be left to the college free of restraint is shown by their choice of preconditions (1) that the Board's action be demonstrably bona fide, (2) extraordinary circumstances, (3) that staff expansions in other areas not be undertaken except in "extraordinary circumstances."
Although abstrusely stated, limitations of the foregoing character are not strangers to the literature of contract law. By their use the parties evidently had something in mind, and to disregard them would render tenure meaningless by allowing the college to serve as the sole judge of its own behavior. The interests involved, after all, are fundamentally incompatible. Each encroaches upon the other. The expansion of one implies a constriction of the other. If a yardstick, however imperfect, whereby to determine where one should yield and the other prevail, was agreed upon, then the court must follow its dictates. In their collective effect these limitations upon the board's discretion are as exact and as well defined as the circumstances permit. They reflect a mutual relative judgment as to how the line should be drawn between cardinal values protected by the shield of academic tenure and those intrinsic to the right of an educational institution to chart its own course. Its further clarification must proceed, *267 as is not uncommon, on a case by case basis within the framework of variant operational facts.
The test best suited to effectuate the intent of the parties on judicial review of the college's action, therefore, is whether the action taken followed from the board's demonstrably bona fide belief, under honestly formulated standards, in the existence of a financial exigency and extraordinary attendant circumstances, and in the necessity for terminating tenured faculty members as a means of relieving the exigent condition. Interrelated therewith is the question of whether sufficient credible evidence of "exigency" and "extraordinary circumstances" exists as to provide a basis for the conclusions reached in the exercise of a reasonable and prudent judgment.
Except for policy differences touching upon the presumption of correctness and burden of proof, the test proposed is materially comparable to that used on judicial review of actions by governmental administrative agencies and in cases involving the discharge of tenured teachers for cause. Bearing in mind the fluidity of the considerations which must be woven together and the extremely severe restrictions which the college has accepted upon its authority to act, it would seem to provide a fair and workable control upon capricious action in the firing of tenured teachers for reason of financial exigency. Compare, Davis, Administrative Law, §§ 29.01, 29.06 (1958) (1970 supp.); Thomas v. Morris Bd. of Ed., 89 N.J. Super. 327 (App. Div. 1965), aff'd 46 N.J. 581 (1966); Quinlan v. No. Bergen Bd. of Ed., 73 N.J. Super. 40 (App. Div. 1962). Application thereof requires that we consider and make allowance for: the obligation incumbent upon the board of trustees to manage the business of the college, to appraise and project existing and future needs and resources and to act in the light of its own best judgment free of outside interference; its duty to honor solemnly undertaken tenure commitments; the objective data relating to the college's financial circumstances, its financial history, the authenticity of the financial threat; *268 evaluations expressed by the board of trustees, the existence of real alternatives to the action taken, and the nature and extent of academic tenure itself. We must somehow orchestrate these dissonant and uncongenial values, rights, obligations, objective facts and subjective judgments into a unified standard by which to judge whether defendants have carried their extraordinary burden of proof in justification for the firing of tenured faculty members and the abrogation of tenure for others. We have done so.
The court concludes that the actions of Bloomfield College with respect to the tenured status of its faculty members in terminating the services of some and placing others on one-year employment contracts under the circumstances presented overflowed the limits of its authority as defined by its own Policies, and therefore fail to constitute a legally valid interruption in the individual plaintiffs' continuity of service. Whatever other motivations defendants might have had, they have failed to demonstrate by a preponderance of the evidence that their purported action was in good faith related to a condition of financial exigency within the institution. These conclusions are compelled by the following enumerated considerations:
(1) Although some financial relief might have been realized by discontinuing the services of the 13 faculty members, it has not been suggested how the college could possibly have been similarly benefited by placing the entire remaining faculty, including tenured personnel, on one-year terminal contracts. This startling action could have produced no immediate financial benefit, could not have been inspired by financial exigency, and can only be interpreted as a calculated repudiation of a contractual duty without any semblance of legal justification. It was a gratuitous challenge to the principle of academic tenure. Its clear implication of ulterior design and lack of sensitivity to the question of moral correctness reflect adversely upon the claimed bona fides of discharging the 13 faculty members for the same given reason.
*269 (2) The hiring of 12 new faculty members between June 21 and September 30, 1973 (the period during which the action complained of took place) has not been justified by a showing of "extraordinary circumstances" as required by sub-paragraph C(6) of the Bloomfield College "Policies." The record is lacking, in fact, any evidence from which it can be determined what the financial consequences of these hirings were, whether they resulted in a savings to the college, and if so in what amount. The explanation that the newcomers were brought in to meet the demands of a modified curriculum is totally unacceptable. Although the testimony is richly festooned with references to "teaching-learning contracts," "interdisciplinary programs," "steady state," "new directions," and "career tracks," the phrases lack content of any value in understanding what the new program was all about. It was only topically delineated and no explanation was offered as to why the tenured faculty members could not meet its requirements. Further, the court is entirely unclear as to the dynamics by which the new directions program was expected to reverse the unfavorable enrollment prognosis. This is notable in view of the fact that the success which defendants claim was anticipated never, in fact, materialized. In any case, the new program was not inaugurated until the fall of 1973, some months after the adoption of Resolution R-58 and after the institution of this suit.
The court had the benefit of the testimony of Dr. William Keast. Dr. Keast is a Professor of English at the University of Texas and serves as chairman of the Commission on Academic Tenure of the American Council on Education, an organization whose membership is composed of some 1,582 educational associations and groups, both national and regional, from 1,376 colleges and universities. He assisted in forming the Commission on Academic Tenure, the function of which was to survey the state of tenure in American higher education, to consider proposed alternatives and to make recommendations. He has also served on the *270 Commission for Academic Affairs of the American Council on Education. Based on the testimony of this witness the court is of the view that termination of tenure based on changes in academic programs can be justified only after a faculty evaluation of the problem. The "standard practice" is to involve the maximum amount of faculty participation to insure sound professional judgment that the long-term purposes of the college will be fulfilled, to insure that the new programs are clearly desirable educationally, that the financial considerations are demonstrably bona fide, and that the best professional judgment is made as to those places in the faculty where reductions should be made in order to achieve the long-term purposes of the college.
(3) The financial problem is one of liquidity, which, as the evidence demonstrates, has plagued the college for many years. The board chairman himself testified that he cannot "remember when financing was ever easy." Unless we are prepared to say that financial exigency is chronic at Bloomfield College, it is difficult to say how, by any reasonable definition, the circumstances can now be pronounced exigent.
Recognizing the right of the board of trustees to make its own business judgments as to how to improve cash flow, still, the yield from a sale of The Knoll has been conservatively estimated at between 1 1/2 and 4 million dollars. Apart from the discontinuation of cash advances to the golf club, the immediate benefits which the college would realize from such a cash infusion has been described. What effect this would have on the school's long-term future is, of course, uncertain. However, it clearly enhances the probability that it will be able to continue as a college for the foreseeable future. This much certainly cannot be said of the expansive development program now being explored. By so commenting, we do not suggest that one or the other of the courses is to be preferred, but that the college's claim of financial exigency can be validated only in its role as an educational *271 institution, not as the aspiring proprietor of high-rise apartments, condominiums and luxury dwellings. Its desire to retain this investment for long-term appreciation is not a factor which the court may weigh in passing upon the existence of a financial exigency. Its immediate duty is to maintain its educational programs and refrain from acts of faithlessness toward the faculty members by whom it has been competently served. In this light the facts surrounding its economic existence cannot reasonably support its claim of demonstrably bona fide financial exigency.
(4) Internal memoranda transmitted within the college itself during the critical period of time are themselves revealing as to the real objectives to be achieved by the adoption of Resolution R-58. For example, in his memorandum to the faculty dated April 12, 1973 President Allshouse advised the faculty of his opposition to the "faculty substitute plan." Reason 3, upon which he places reliance, reads:
The document explicitly placed adherence to the 1940 and 1958 AAUP Statements on academic freedom, tenure, and due process as the primary criterion for staff reductions rather than academic planning for the long term viability of the College. [Emphasis supplied]
It would appear that Dr. Allshouse's real concern is more fully addressed to balancing problems of long-term concern against basic contractual obligations, whereas the position relied on herein is a claim of financial exigency, an immediate, compelling crisis. His hostility to the basic concept of tenure is further elaborated in his report to the board of trustees dated June 21, 1973 wherein, under paragraph B, he analyzes at great length the faculty's "substitute plan" and in so doing engages almost entirely in partisan polemics having to do with the pros and cons of tenure unrelated to any question of financial crisis.
(5) Revealing also is the first paragraph in the report to the board of trustees from the college's Commission to Review Tenure and Retirement Policy dated June 21, 1973 *272 in which it clearly focuses upon the issue of the "tenure system," not with a bona fide attempt to reconcile the fact of tenure with the reality of a true financial exigency:
For the last six months, the Commission to Review Tenure and Retirement Policy has reviewed the present practices of the College regarding tenure, the debate over tenure throughout the country, and alternatives to a traditonal tenure system. While it has studied the larger issues concerning tenure which are being faced by institutions across the country, it has attempted to focus on the needs of Bloomfield College as it faces the development of a new and distinctive mission to meet the challenge of the 1970's and 80's. As a result of our deliberations, we have concluded that the present tenure system be abolished and that a new term-contract system be established. At the October meeting of the Board, the Commission will present a series of proposals for a contract system, a plan for implementation (including timetables) and a series of revisions to the Bloomfield College Policies on Employment and Tenure.
(6) Further confirming the impression that the defendants' primary objective was the abolition of tenure at Bloomfield College, not the alleviation of financial stringency, is their careful eschewal of other obvious remedial measures such as across-the-board salary reductions for all faculty members and reduction of faculty size by nonrenewal of contracts with teachers on probationary status, rather than termination of those who had earned tenured status by years of competent service.
The conclusions herein reached are not in their nature unique. Courts have not hesitated to invalidate the dismissal of tenured personnel where the reasons of economy given for their dismissal were shown to have been used as a subterfuge. Walker v. Wildwood Bd. of Ed., 120 N.J.L. 408 (Sup. Ct. 1938); Viemeister v. Prospect Park Bd. of Ed., 5 N.J. Super. 215 (App. Div. 1949); Downs v. Hoboken Bd. of Ed., 13 N.J. Misc. 853, 181 A. 688 (Sup. Ct. 1935); Wall v. Stanley County Bd. of Ed., 378 F.2d 275 (4 Cir.1967); Chambers v. Hendersonville City Bd. of Ed. 364 F.2d 189 (4 Cir.1966); 68 Am. Jur.2d, Schools, § 168; Annotation, 100 A.L.R.2d 1141, 1179.
*273 Defendants' resistance to the remedy of specific performance rests upon that line of authority denying such relief in the case of contracts for personal services on the ground that equity will not compel the continuation of an obnoxious personal relationship. See Sarokhan v. Fair Lawn Memorial Hospital, 83 N.J. Super. 127, 133 (App. Div. 1964); 11 Williston, Contracts (3 ed. 1968), § 1450; 5A Corbin, Contracts § 1204 (1964); 42 Am. Jur.2d, Injunctions, §§ 101, 102. The rationale of these authorities within the context of a teaching contract case is well expressed in Greene v. Howard University, 271 F. Supp. 609 (D.C.D.C. 1967), rem. on other grounds 134 U.S. App. D.C. 81, 412 F.2d 1128 (1969). After stating that such a contract may not be enforced by specific performance, the court observed:
It would be intolerable for the courts to interject themselves and to require an educational institution to hire or to maintain on its staff a professor or instructor whom it deemed undesirable and did not wish to employ. For the courts to impose such a requirement would be an interference with the operation of institutions of higher learning contrary to established principles of law and to the best tradition of education. [271 F. Supp. at 615]
But the conditions upon which this reasoning rests do not prevail in the case presented. The rule is not hard and fast, and, as Williston observes, "appealing factual situations may occasionally induce a court to enforce a personal service contract specifically, particularly in the absence of any personal relationship between the parties." 11 Williston, Contracts, § 1424 at 786-787. This is not a case in which termination was based on any dissatisfaction with the services rendered, but ostensibly only by reason of financial exigency. It was an action taken with deep regret and with recognition of the "invaluable contribution to the College" made by the terminated faculty members.
The dangers envisioned by Greene v. Howard University, supra, are conspicuously absent, and no reason appears as to why reinstatement cannot be ordered here as has been done so often in the numerous cases involving public educational institutions. While it is true that in the latter *274 class of cases reinstatement orders have in the main derived from statutory provisions coupled with the court's power to issue writs of mandamus, the substance of the action taken has been nothing more than to compel adherence to academic tenure commitments on the part of an educational institution. This is the route by which specific performance is obtained against a state body on the basis of contracts arising from statute. Acting otherwise in the case of a private institution would have us capitulate to a naked legalism in a manner unsuitable to the office of a Court of Chancery. Equity never permits a rigid principle of law to smother the factual realities to which it is sought to be applied. Equitable remedies are distinguished for their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. The court of equity has the power of devising the remedy and shaping it so as to fit the changing circumstances of every case and the complex relationship of all the parties. Grieco v. Grieco, 38 N.J. Super. 593, 598 (App. Div. 1956); Sosanie v. Pernetti Holding Corp., 115 N.J. Super. 409, 414 (Ch. 1971); Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403 (E. & A. 1938); 1 Pomeroy's Equity Jurisprudence (5 ed. 1941), § 109.
As defendants themselves point out, the uncertainties involved in ascertaining damages for breach of a contract of indefinite duration are such that we cannot say that plaintiffs have a full, complete and adequate remedy at law. See Fleischer v. James Drug Stores, Inc., 1 N.J. 138, 147 (1948). Specific performance will be granted if it will do more perfect and complete justice. Id. at 146. Whatever may be said as to the innovative aspect of granting the remedy of specific performance within this somewhat novel setting, such considerations are clearly outweighed by our duty to find a remedy. Crane v. Bielski, 15 N.J. 342, 349 (1954).
Although the issue of mutuality of remedy, Sarokhan v. Fair Lawn Memorial Hosp., Inc., 83 N.J. Super. 127, 135 (App. Div. 1964), has not been raised by defendants, *275 it should be noted that serious doubt exists as to whether the doctrine is viable in this State so as to defeat a claim for specific performance. "It is not necessary, to serve the ends of equal justice, that the parties shall have identical remedies in case of breach." Fleischer v. James Drug Stores, 1 N.J. supra at 149, speaking with reference to an application for specific performance. And see 5A Corbin, Contracts, § 1180 at 331, wherein the foregoing authority is cited as placing New Jersey among those states which have substantially repudiated the requirement of mutuality of remedy as a prerequisite to specific performance. Also see the discussion in K & J Clayton Bldg. Corp. v. Keuffel & Esser Co., 113 N.J. Super. 50, 53-55 (Ch. Div. 1971). Even where the rule prevails it is disfavored in cases where there has been full performance on the part of plaintiff, since its purpose is to make certain that the court shall not compel a performance by a defendant for which he may fail to receive the agreed upon exchange. Restatement, Contracts, § 372; 5A Corbin, Contracts, § 1181 at 336. For our purposes completion by the individual plaintiffs of their seven-year probationary periods constitutes full performance of their obligations in return for which they have been granted tenured status.
For the reasons given it is concluded that the individual plaintiffs who were terminated from their positions as faculty members of Bloomfield College are entitled to reinstatement under the terms and conditions of the "Bloomfield College Policies on Employment and Tenure." By way of declaratory relief it will further be adjudged that all plaintiffs serving as tenured faculty members of Bloomfield College prior to June 21, 1973 are now, and shall continue, on tenured status within the terms of the "Bloomfield College Policies on Employment and Tenure," and that the provisions of Resolution R-58 to the contrary, adopted on June 21, 1973 by the Bloomfield College Board of Trustees, as well as all administrative actions taken thereunder by defendants, are in all respects inefficacious.