**JeRoyd W. GREENE et al., Appellants,**

v.

**HOWARD UNIVERSITY, a Corporation, Appellee.**

**Nathan HARE, Appellant,**

v.

**HOWARD UNIVERSITY, a Corporation, Appellee.**

**Nos. 21267, 21268.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 6, 1969.

Decided June 17, 1969.

Mr. Michael Nussbaum, Washington, D. C., for student appellants in No. 21,-267.

Mr. Richard M. Millman, Washington, D. C., for faculty appellants in No. 21,-267 and appellant in No. 21,268.

Mr. Dorsey Edward Lane, with whom Mr. George E. C. Hayes, Washington, D. C., was on the brief, for appellee.

Before BURGER, WRIGHT and McGOW-AN, Circuit Judges.

McGOWAN, Circuit Judge:

This appeal is from the denial by the District Court of motions for a preliminary injunction. 271 F.Supp. 609 (1967). One group of appellants consists of four persons who were students at Howard University in the spring of 1967 when serious disturbances occurred on the campus. The second is made up of five faculty members holding non-tenured positions at that time. After making an investigation which purported to find both groups actively involved in the disorders, the University, without according them a hearing of any kind although one was requested, terminated the connection of both student and faculty appellants with the school as of the close of the academic year on June 30.[1]

---

1. This was accomplished in the case of the student appellants by written notice that they would not be permitted to enroll for the next academic term. The faculty appellants were notified that their contracts expiring June 30 would not be renewed.

Actions were brought by these student and faculty groups to restrain the University from interfering with the relationships between them and the University. We hold that (1) the litigation has become moot as to the student appellants, and (2) the faculty appellants have stated a cause of action which, upon proof of monetary damage, would entitle them to relief of that nature.

I

Upon noticing an appeal in this court, the student appellants, seeking to continue as students in the University, moved alternatively for summary reversal or for an injunction pending appeal. A division of this court directed the University to permit the movants to reenroll pending disposition of the appeal or further order of the court, and held the request for summary reversal in abeyance pending consideration by the University of the possibility of affording these appellants a hearing.

The University promptly complied with the direction to permit continuation by the student appellants in the University. It now appears that, of these appellants, one voluntarily chose to continue his studies at another institution, two have graduated from Howard and received their diplomas, and the fourth is currently enrolled and will in due course, assuming no academic or other disqualification, graduate also. At oral argument it was represented to us by counsel for Howard that this student would be permitted to finish his studies no matter what our decision might be.

Thus it appears that the student appellants, seeking the remedy of an opportunity to pursue their studies at Howard, have in fact received that remedy. This lawsuit has, accordingly, lost its adversary character and is no longer meaningful in terms of the actual controversies which courts exist to resolve.

In terminating this aspect of the litigation, we are not unmindful that this episode might conceivably have collateral consequences for the students of an adverse character. The student appellants, however, have made no representations to us of any such consequences as militating against our disposition of their appeal as moot. Compare Scoggin v. Lincoln Univ., 291 F.Supp. 161, 170–171 (W.D.Mo.1968). It also appears from the record that the University was, even prior to our earlier direction for reenrollment *pendente lite*, making every effort to limit the adverse inferences which might be drawn from its action in informing appellants that they must seek their schooling elsewhere after the close of the 1967 spring semester. The University's Dean testified as follows in characterization of that action:

"Well, first of all, the action taken was not construed as disciplinary action. These students were allowed to complete their semester work and their relationship dissolved, terminated, and they retained the right to seek transfer to another institution without prejudice and there was no record notation made, as would have been made if there had been or if there is a hearing."

It was also represented to us at oral argument by counsel for the University that one of the student appellants was accepted for admission to the Law School of the University after the temporary ban upon his continuing his undergraduate course of study. The fact that the University has invited the disposition of mootness places a responsibility upon it to negate so far as possible adverse consequences of the kind here in contemplation, and we have no reason to doubt the University's sensitivity to this consideration.

▇ Counsel for Howard at oral argument stated his belief to be that there was no reflection in the students' official transcripts of the temporary prohibition of their reaffiliation with the University for the new academic year, but was unable to give final assurances on this score for lack of personal knowledge. Under these circumstances our dismissal for mootness, which the University at oral argument affirmatively sought, is con-

ditioned upon the complete effacement from the University records of these appellants of any reference, if such there now be, to the hiatus in the relationship which the University purported to have effected during the few weeks between June 30, 1967, and the University's compliance with the court's order of September 8, 1967. Our order will make appropriate provision for such expungement wherever necessary.

## II

The teacher appellants also sought summary reversal or an injunction pending appeal; and the division of the court referred to above denied the latter while holding the former in abeyance "pending consideration by appellee of granting said appellants a hearing." By a petition for rehearing *en banc*, the University challenged this action of the division, but the petition was denied. Thereafter the University reported to the court its decision to permit the student appellants to reenroll, but to deny the teacher appellants either a hearing or reinstatement. This prompted the latter to renew their motions for summary reversal, but they were denied by the division in an order which said:

"Notwithstanding the substantial question whether the requested hearings are required, we deny the motions for summary reversal and immediate reinstatement since we think appel-

lant faculty members have an adequate remedy at law. \* \* \* "

This distinction drawn by the motions panel between the students and the faculty members in terms of adequacy of the remedies at law available to the latter was, we think, well taken. It reflects, among other things, the fact that, unlike the students, an employment relationship rooted in contract existed between the faculty members and the University; and we note that the complaints filed in the District Court on behalf of the teachers purport to state a cause of action sounding in contract as well as in a deprivation of constitutional right. Since we think that, if entitled to prevail under either approach, the appropriate remedy on this record is legal in character, we address ourselves in the first instance to the non-constitutional ground.

We conclude that the contractual relationships existing here, when viewed against the regulations prescribed for, and the practices customarily followed in, their administration, required the University in the special circumstances here involved to afford the teachers an opportunity to be heard. The University's failure to do so gives the teachers the privilege in the District Court of proving and recovering the damages, if any, caused each of them by the nonrenewal of their contracts; and we remand to the District Court for this purpose.[2]

2. This disposition makes it unnecessary to deal definitively with the claim that the University is invested with a public character which renders it subject to the Bill of Rights, and that a consequence of that status is the obligation, by reason of the due process clause of the Fifth Amendment, to accord a hearing in circumstances like those involved in this case. This claim, which was pressed with special force on behalf of the student appellants, was sought to be supported by a variety of evidentiary items suggestive of non-private elements in the University's structure and provenance, including the fact that direct appropriations by Congress account for over half of the University's annual operating budget. *See,* e. g., Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963),

cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964), and Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The District Court appeared to believe that the claim was concluded by expressions of this court in Maiatico Const. Co. v. United States, 65 App.D.C. 62, 79 F.2d 418, cert. denied, United States to Use of Phelps v. Maiatico Const. Co., 296 U.S. 649, 56 S.Ct. 309, 80 L.Ed. 462 (1935), and Irwin v. United States to Use of Noland Co., 74 App.D.C. 296, 122 F.2d 73 (1941), rev'd on other grounds, 316 U.S. 23, 62 S.Ct. 899, 86 L.Ed. 1241 (1942). We note only that the subject matter of those cases was far removed from the matter at hand and that, in any event, the amenability to constitutional commands of what was once widely assumed

## III

The teacher appellants had not achieved a tenure status and thus, in the familiar academic tradition, the renewal of their appointments was at the University's pleasure. They do not now challenge the general applicability of this principle. Instead, they assert that the University failed in its obligation, incident to their contracts, to give the appropriate advance notice of non-renewal. They point out that, far from having given such notice, the University explicitly refrained from doing so under circumstances which warranted appellants in entertaining and acting upon the clear expectations that their reappointments would be forthcoming. In these conditions, say appellants, irrespective of the generally unqualified nature of the University's power to determine whether non-tenure teachers shall continue beyond their appointed terms, the University was required, if it gave a last-minute notice of non-renewal because of alleged campus misconduct, to allow appellants to be heard on those charges before making them the occasion of non-renewal.

It is helpful in this regard to examine the relevant sections of the Faculty Handbook, a manual which governs the relationship between faculty members and the University.[3] Section VIII states the normal University practice with respect to dismissals:

A. The Board of Trustees reserves the right of dismissal, regardless of tenure, in cases of moral delinquency, or other personal conduct incompatible with the welfare of the University. In such cases, the President of the University reserves the right of immediate suspension, regardless of tenure. The person concerned, upon written request, shall be given a hearing before a committee of the Board of Trustees, prior to the meeting of the Board of Trustees at which final action on the case is taken under procedures to be established by the Board of Trustees.

B. The Board of Trustees reserves the right of dismissal, regardless of tenure, for professional conduct incompatible with the best interests of the University. The person will be given reasonable notice and an opportunity to be heard by a committee of his peers with the right to a hearing by a committee of the Board of Trustees, prior to the meeting of the Board of Trustees at which final action on the case is taken under procedures to be established by the Board of Trustees.

Section IX states its position as to notice of Non-reappointment and Reappointment:

Notice of Non-reappointment and Reappointment: It will be the practice of the University, without contractual obligation to do so, to give written notice at the following times to officers of instruction whose services are no longer required: A) Deans will give notice each year to those whose terms expire and whom they do not propose to recommend for reappointment, not later than December 15 of that year; B) The Board of Trustees will give notice to those teachers whose terms expire and whose services are no longer required, directly following its meeting in January of each year.

EXCEPTIONS: An exception to this practice will obtain in the case of teachers on one-year appointments to whom the Board of Trustees will give notice immediately following its meeting in April; the Dean will give notice to such persons not later than March 15. Teachers not to be continued as regular appointees at the conclusion of seven years of service will be notified one year prior to the expiration of the seventh year.

---

to be purely private activity is a fluid and developing concept.

3. The manual also summarizes the usual and customary practice which had built up in the University-faculty relationship. *See* A. Corbin, Contracts §§ 556, 558 (1960); Restatement of Contracts § 246 (1932); Uniform Commercial Code § 1–205.

A member of the faculty who wishes to resign from an appointment at the end of a given year is expected to notify his dean or the proper administrative official in writing not later than April 15th of that year."

It is clear from a close examination of these sections, buttressed by affidavits and depositions admitted in the District Court, that the usual practice of the University was to inform non-tenured faculty members by January or April, depending on the length of their appointments, whether they would be reappointed for the next school year.[4] This gave them the opportunity to seek employment elsewhere in the event they were not rehired. And it is significant to note in Section IX a corresponding obligation of the faculty member to inform the University if he intends not to return the next year, a provision presumably added to the Handbook in order to insure that the University would not be obligated to search for a replacement at a time after the market has become foreshortened.[5]

It is instructive against this background to look at those facts which are undisputed in the case of Dr. Andress Taylor, a teacher appellant whose situation is not untypical of that of the other such appellants. On March 15, 1967, Dr. Taylor's name was among those recommended by his Dean to be continued as an Assistant Professor of English for a term of two years to run from July 1, 1967 to June 30, 1969. On or about April 1, 1967, Dr. Taylor requested from his department head a leave of absence for the next academic year in order that he might take a position with the Southern Teaching Program.[6] The chairman, however, ruled that Dr. Taylor's services were required at Howard in

that period; and Dr. Taylor, in reliance upon this opinion, rejected the offer.

On May 5, 1967, Dr. Taylor received a "good" rating from his department chairman. On May 22, 1967, the chairman assigned him a course for the fall semester and requested that he produce a reading list. On June 2, 1967, the Director of the Summer School wrote to Dr. Taylor that he had been recommended for an appointment to the staff of the 1967 summer session at Howard.

However, on June 20, 1967 Dr. Taylor received a letter, dated June 19, 1967, but apparently postmarked June 20, 1967, from the Dean of his school informing him that, after the automatic termination of his contract on June 30, 1967, he was not to be "reappointed by the University."

It must be clear that, for all practical intents and purposes, Dr. Taylor had been rehired to teach at Howard for a further period. The record here indicates that the University abruptly changed its mind about this reappointment because its unilateral investigation of the campus disturbances implicated Dr. Taylor. But the record also discloses that Dr. Taylor received no opportunity to be heard on the existence or extent of his involvement in the turmoil, either before or after the non-reappointment letter was sent.

It should be pointed out, moreover, that Dr. Taylor and his fellow appellants were relying not only on personal assurances from University officials and on their recognition of the common practice of the University, but also on the written statements of University policy contained in the Faculty Handbook under whose terms they were employed.[7] The

---

4. This usual practice, of course, can be raised to the level of a contractual obligation. *See* note 3, *supra.*

5. Appellants' reliance upon the University's intention to reemploy them was obvious. This provision buttresses that reliance by imposing an obligation on faculty members upon which the University might rely.

6. Dr. Taylor also received another job offer and a second tentative exploratory offer which he declined on the ground that he was committed to Howard.

7. In this regard, the court may take judicial notice of the fact that, in its Handbook, the University purports to accept as guiding principles the policy of the American Association of University Professors in

Handbook makes clear, in writing, what the appellants knew to be true in practice: a faculty member, if not finally informed by April 15 (with preliminary notice by March 15) that his contract was not to be renewed, had legitimate reason to believe that he could rely on returning to Howard the following semester.[8]

In the District Court, as here, the University does not deny the force of its regulations and practices in respect of appearing to elevate timely notice of non-reappointment to a contractual status. It argues only that what it gave with one hand it took away simultaneously with the other. It takes its stand, as did the District Court, upon the inclusion in Section IX of the Handbook of the words "without contractual obligation to do so" in the affirmative statement of its purpose to give such notice by certain fixed dates. This qualifying clause, so it is said, relieves the University of any and all obligations of any kind with respect to the observance of its regulations, and vests in the University an unfettered discretion to deny reappointment at any time up to midnight of June 30 whether or not earlier notice has been given.[9]

---

matters of academic tenure. That policy was stated in the American Association of University Professors Bulletin (Autumn, 1964) and reads as follows:

THE STANDARDS FOR NOTICE
OF NONREAPPOINTMENT
(Endorsed by The Fiftieth
Annual Meeting)

Because a probationary appointment, even though for a fixed or stated term, carries an expectation of renewal, the faculty member should be explicitly informed of a decision not to renew his appointment, in order that he may seek a position at another college or university. Such notice should be given at an early date, since a failure to secure another position for the ensuing academic year will deny the faculty member the opportunity to practice his profession. The purpose of this Statement is to set forth in detail, for the use of the academic profession, those standards for notice of nonreappointment which the Association over a period of years has actively supported and which are expressed as a general principle in the 1940 Statement of Principles on Academic Freedom and Tenure.

The Standards for Notice

Notice of nonreappointment, or of intention not to recommend reappointment to the governing board, should be given in writing in accordance with the following standards:

(1) Not later than March 1 of the first academic year of service, if the appointment expires at the end of that year; or, if a one-year appointment terminates during an academic year, at least three months in advance of its termination.

(2) Not later than December 15 of the second academic year of service, if the appointment expires at the end of that year; or, if an initial two-year appointment terminates during an academic year, at least six months in advance of its termination.

(3) At least twelve months before the expiration of an appointment after two or more years in the institution.

8. *See* Restatement (Second) of Contracts § 90 (Tent. Draft No. 2, 1965) which supports a finding that a contract between Howard and the teacher appellants had been breached. *See also* Henderson, Promissory Estoppel and Traditional Contract Doctrine, 78 Yale L.J. 343 (1969), where it is shown that promissory estoppel has application in the field of bargain transactions, as well as in the area of gratuitous promises.

9. It would be interesting to test the breadth of this claim where notice of reappointment had been formally given before June 30 and then, because of some alleged misconduct later occurring, withdrawn at the last moment without giving the appointee any chance to be heard on the cause of the switch. We think it would be difficult indeed for any responsible educational institution to withhold in those circumstances the opportunity for a hearing which is given by Section VIII to tenured employees, at least if it had even the slightest degree of concern over its standing with the American Association of University Professors and respectable academic opinion generally. And reliance solely upon the clause in question would be, at best, a lame instrument for defining

■ Thus, as noted above, when notice of non-reappointment is withheld beyond the required date, we think some qualifications come into being—qualifications, moreover, which are not to be automatically considered as negated by the disclaimer invoked here, nor which, indeed, are necessarily at odds with it as a matter of rational interpretation of the bargain the parties may be taken to have struck.[10] Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.

The employment contracts of appellants here comprehend as essential parts of themselves the hiring policies and practices of the University as embodied in its employment regulations and customs. The very phrase relied upon by the District Court is in a Faculty Handbook which is replete with other provisions in conflict with the spirit of the use of that phrase now sought to be made. Those provisions seem to us to contemplate a hearing before separating from the academic community for alleged misconduct one who, although a non-tenured employee, has acquired a different dimension of relationship because of the expectations inherent in the University's failure to give notice as contemplated by its own regulations.

That new relationship does not at all mean that the University must invariably reappoint whenever it fails to give notice at the specified time. Of course there may be happenings after that time which bear upon the fitness of a particular person to continue as a member of an academic community. But, in the circumstances which are undisputedly shown by this record, and as we construe the contractual undertakings between the University and these appellants, we hold that appellants should have been afforded an opportunity to give their version of the events which led to their non-reappointment because of misconduct.

## IV

A lengthy hearing was held in the District Court upon the motion for a preliminary injunction, and a considerable amount of evidence was adduced by both sides. For the purposes of the disposition we make, the relevant portions of that evidence present no significant unresolved disputes of fact; and it would appear that the parties did not contemplate further or different showings with respect to permanent injunctive relief.

■ We think the record as it stands adequately supports our conclusion that the University acted in contravention of its contractual undertakings *vis-a-vis* the teacher appellants, and we see no necessity for further litigation of this issue in the District Court. What remains is the question of what pecuniary damage, if any, the individual teacher appellants have suffered by reason of the University's failure to effect nonreappointment in a manner compatible with its contractual obligations. The legal injury done by that failure could not now be repaired by affording appellants the hearing which they sought and were denied at the time their reappointments were withheld. The breach of contract resides in the failure to give the hearing then, and does not turn upon what the outcome of such a hearing might be now.

---

the framework of relationships between the University and the victim of its about-face.

10. The disclaimer may well have been included in the manual out of an abundance of caution, only for the purpose of guaranteeing that the other sections of the man-

ual could be applied in the case of a non-tenured faculty member who had not received notice of termination before April 15, but as to whom the University had newly-discovered cause not to reappoint in the period between April 15 and the beginning of the next academic year.

Although the denial of injunctive relief presently appealed from is left undisturbed, we remand the case to the District Court for the purpose of permitting any of the faculty appellants to pursue, if he so chooses, a claim for the monetary damage, if any, attributable to the non-reappointment. The District Court will permit such amendment of the complaints as may be sought to this end, and it will otherwise proceed further in a manner consistent herewith.

It is so ordered.

Circuit Judge BURGER did not participate in the foregoing decision.