Clarence PRIDE, Jr., Appellant,

v.

HOWARD UNIVERSITY, Appellee.

No. 11234.

District of Columbia Court of Appeals.

Argued Sept. 14, 1977.

Decided March 9, 1978.

---

R. Kenneth Mundy, Washington, D. C., for appellant.

Madelyn C. Squire, with whom Dorsey Edward Lane, Washington, D. C., was on the brief, for appellee.

Before KERN, HARRIS and FERREN, Associate Judges.

KERN, Associate Judge:

Appellant unsuccessfully sought in the trial court to recover damages from Howard University incurred, he alleged, because the University proceedings followed in determining a charge of misconduct against him were improper.

Appellant, a student enrolled in appellee's college of medicine, was accused of cheating on an examination he took during the spring of his sophomore year. The University's System of Judiciaries and Code of Conduct (Code) establishes a two-tier system of panels to hear and act upon allegations of student misconduct, including cheating. The Judiciary Board conducts a trial-type proceeding where testimony and

evidence are adduced. Decisions of the Judiciary Board are reviewable by the Board of Appeals, which may concur with the "opinion" of the Judiciary Board "or impose a lighter penalty or acquit the defendant." The membership of each Board, according to the Code, is to consist of a non-voting chairman, with four faculty and four student members. While the Code specifies the composition of both the Judiciary Board and the Board of Appeals, it is silent as to what constitutes a quorum of these bodies and provides only that the Judiciary Board may "by majority vote of the membership" recommend a penalty, and that the Board of Appeals "by a majority vote" may concur or otherwise dispose of the appeal.[1]

The Judiciary Board heard the charge against appellant during June 1973, but one of the four student members had by that time graduated and another student member was not present. Appellant's counsel objected to the Board then proceeding but the Chairman overruled him and the witnesses and other evidence were presented. Four members of the Board found appellant guilty of cheating, one abstained from voting and the remaining member present voted in favor of appellant. The Board recommended appellant's indefinite suspension.

Appellant sought Board of Appeals' review of the Judiciary Board's decision. Prior to the commencement of the Board of Appeals' proceedings, appellant objected to its membership composition since one of the four student members was absent. His objection was overruled and the Board of Appeals then denied the request of appellant's counsel to recall witnesses who had appeared at the initial hearing before the Judiciary Board. The appeal was argued on the basis of the record established before the Judiciary Board. The Board of Appeals upheld by a vote of six to one the Judiciary

Board's determination of guilt. However, the Board modified the penalty from indefinite suspension to suspension for one year and applied this suspension to the 1973–74 academic year.

Following the Board of Appeals' adverse decision, appellant initiated suit against appellee, alleging that the "hearing conducted by the Judiciary Board was in contravention of the rules and provisions governing such proceedings." He sought, *inter alia,* $100,000 in damages and injunctive relief from his suspension for cheating. Appellant's requests for a temporary restraining order and a preliminary injunction were heard and denied. Meanwhile, appellant was readmitted to the medical college for the fall term beginning in August 1974. Because of the earlier finding of cheating, appellant's reenrollment was with the understanding that he was on academic probation and subjected him to two conditions: that he (1) repeat his entire sophomore year, and (2) be subject to dismissal for failure of any one of his courses. After his reinstatement, appellant failed four subjects and his enrollment was terminated during January 1975, one semester after his readmission on probation.

When appellant's case against the University came to trial, counsel and court agreed that the merits of the cheating charge would not be retried; rather, they settled on the issues to be resolved as (1) whether or not the university bodies which heard and determined the cheating charge against appellant were properly constituted, and (2) assuming not, whether their finding of cheating on his part constituted such a stigma as to have caused his failure after he was readmitted for the 1974–75 academic year. The court, after hearing testimony, concluded that appellant "had been afforded a fair hearing" and "any defect

---

1. The Code provides that: "[T]here shall be a judiciary board of Nine members in each school and college of the University. . . . A faculty or student chairman of a judiciary board shall be appointed by the Dean or elected by the faculty. . . . There shall be eight voting members of the Judiciary: of the four student members, two shall be appointed by the Student Council of each school . . . and two picked in a general student election; the four faculty members shall be elected by the faculty of each school."

The Code also provides that "the Board of Appeals, in all instances shall be composed of four faculty members and four students."

which might have inhered in the composition of the Judiciary Board was cured by the hearing before the Board of Appeals"; appellant, by accepting reenrollment in the college of medicine thereby waived any "defects" that may have existed in the proceedings before the two Boards; and, appellant had failed to show that his academic failure after one term of reenrollment "was caused by or related to" the cheating incident.

We have no occasion to consider the correctness of the trial court's second and third conclusions. We rest our decision of affirmance on a different ground than the trial judge: that the Judiciary Board and the Board of Appeals were not so deficient in composition as to invalidate their decisions.

■ We understand appellant's argument to rest on the proposition established by *Basch v. George Washington University,* D.C.App., 370 A.2d 1364, 1366 (1976), that a contractual relationship exists between a university and its students.[2] Since in *Basch,* provisions of the university's bulletin were deemed part of its contract with the students, the parties to this appeal assume, and we accept this assumption, that the Code, which was contained in the manual given to each student, constituted a part of the contract between appellant and appellee. Appellant then argues, in essence, that the Judiciary Board could hear and determine the misconduct charge against him *only* if *all* its eight members were present and participating. Since one student member had already graduated and another member was absent when the hearing of the cheating charge was commenced in June 1973, he contends the university breached its contract with him when the Judiciary Board proceeded with but six members present.

We said in *Basch, supra* at 1367, a case raising the construction of a student-university contract, that "the document itself must be viewed as a whole" and "the court should view the language of the document as would a reasonable person in the position of the parties."

We note that "the document itself" in the instant case, *viz.,* the Code, is abbreviated in nature; it does not purport to establish university disciplinary procedures with the particularity of a criminal code, and it does not specify the mechanics of the hearing process or state what constitutes a quorum. The Code is silent concerning removal or replacement of members of the Board who refuse to attend, are no longer enrolled in the University, or are themselves accused of misconduct. Appellant's interpretation, which would require every member of the Judiciary Board to be present before it could proceed, is likely to generate excessive delay—wholly contrary to the intent of the System of Judiciaries.[3]

■ There is another reason why we must reject appellant's contention that by proceeding without all eight Board members the University breached its contract, *viz.,* the Code. A fair reading of the record

---

2. Initially, we comment that we should be reluctant to construe the rules and procedures of a private university, particularly in the instant case where the University Senate Council is empowered to entertain and adopt modifications to the System of Judiciaries and Code of Conduct. Our reluctance stems from an appreciation both of the autonomous role universities have historically enjoyed regarding their own governance and considerations relevant to academic freedom. However, the narrow issue presented squarely to us in this case raises a procedural matter as opposed to a determination of an academic matter.

3. The Code exhibits its drafter's desire for speedy proceedings. Part II(E) requires the Boards to render judgment within a "reasona-

ble time" and notify the student within 48 hours thereafter. A student may petition for rehearing within five days of the notice of the Board's decision. More importantly, Part II(J) reads: "Any actions brought against the student must result in the filing of charges within 30 days after information concerning the offense is received." The spirit of this provision would be frustrated by a requirement that the Board only proceed if all members were present. The speedy filing of charges is only relevant in the context of an equally prompt hearing. Appellant's interpretation, which makes the Board susceptible to obstruction and delays by reason of absences, is at odds with this reading of the Code.

reflects that the University's practice was not to replace Board members who had graduated until the following fall term. This practice was in effect at the time the "contract" between appellant and appellee was formed, viz., when he received the student manual containing the description of the System of Judiciaries. It has been established that the *usual practices* surrounding a contractual relationship can themselves be raised to the level of a contractual obligation. *Greene v. Howard University,* 134 U.S.App.D.C. 81, 86, 412 F.2d 1128, 1133 (1969). In *Greene,* the federal appeals court here concluded, in the face of an express term to the contrary,[4] that Howard University was contractually obligated to follow its usual practices with respect to the reappointment of non-tenured faculty members.

> Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. *This is especially true of contracts in and among a community of scholars,* which is what a university is. The readings of the market place are not invariably apt in this non-commercial context.

4. The faculty handbook which governed relations between faculty members and Howard University specifically disclaimed any contractual obligation for the university to give a faculty member notice of non-appointment by a specified date:
   > Notice of Non-reappointment and Reappointment: It will be the practice of the University, *without contractual obligation to do so,* to give written notice at the following times to officers of instruction whose services are no longer required . . . . [*Greene v. Howard University, supra* at 85, 412 F.2d at 1132; emphasis added.]

5. By way of analogy, local usages and customs can serve as aids in commercial contexts to contractual interpretation, and if the parties contracted with reference to them, these usages are determinative. *See* D.C.Code 1973, § 28–1–205, *see also,* Restatement, Contracts § 227.

6. Regarding the appointment of student Board members during summer sessions, part IV(C) of the Code states:
   > Student members will be appointed by the incumbent student councils from students *who are enrolled in Summer School.* [Emphasis added.]

The employment contract of appellants here comprehend as essential parts of themselves the hiring *policies and practices* of the University as embodied in its employment regulations and *customs.* [*Greene v. Howard University, supra* at 88, 412 F.2d at 1135; emphasis added.]

Similarly, we conclude in the instant case that the usual disciplinary procedure and practice of the Judiciary Board in effect at the time of the formation of the contract between Howard University and appellant, viz., hearing and determining a case without a member who has graduated, effectively constituted a part of their agreement.[5]

Appellant also argues that the University breached its contract because the Board recommended his suspension in the face of a provision in the Code that such penalty may be recommended by "majority vote of the membership" and only four members voted to suspend. However, as we have pointed out, the membership of the Board in June 1973 was but seven and hence the four who voted to suspend appellant did constitute a "majority" as prescribed by the Code.[6]

Although there is no comparable requirement expressly applying to the appointment of Board members who serve during the regular academic year, it seems logical to conclude that enrollment in the university is a prerequisite to Board membership. To conclude otherwise would produce the unreasonable result that a non-student could sit on a Board in the fall and spring semesters, but not during the Summer Session. As a result, we are of the opinion that the provisions of the Code limit membership on the Boards to students who are currently enrolled in the University. This conclusion is fatal to appellant's argument that under the Code, a penalty could be imposed *only* by a majority vote of the *eight members of the Board.* Appellant contends that since the Code expressly provides the Judiciary Board may impose a penalty "by majority vote of the membership," this means a majority not of the members present who constitute a quorum, but a majority of the eight voting members. However, since the "membership" of the Board can consist only of students enrolled in the university and since the Code is silent regarding the replacement of duly appointed members, we conclude that the "membership" of the Board, at the time the appellant's case was heard, consisted of only seven members since the

We are confronted with the further fact, however, that the Board proceeded to hear and determine appellant's case with one student member absent—as distinguished from the other student member who had graduated. Since the Code is silent on what constitutes a quorum of the Board, it is required, as appellant views the Code, to have all its members present before hearing and determining misconduct cases. Since the Board did not do so, a breach of the university's contract with its students has occurred in appellant's view.[7] We are required, however, in construing the contract, *viz.,* the Code, to view it "as a whole" and "as would a reasonable person in the position of the parties." The Code's silence as to what constitutes a quorum is readily understandable in light of the fact that it is not a detailed document purporting to anticipate and prescribe for every eventuality. We deem it unreasonable to read the Code as requiring every member to be present before the Board can act. We have no difficulty in concluding that a reasonable person in the parties' position would assume that, consistent with the usual rule of law, the Board could proceed to act if a quorum—normally a majority—were present. *Kaiser v. Real Estate Commission,* D.C.Mun.App., 155 A.2d 715, 717 (1959).

Appellant advances at some length an argument on the sufficiency of the evidence adduced at the Board's hearing to support the cheating charge but this argument was waived in the trial court and hence it is not properly before us.

*Affirmed.*

eighth member had graduated from the university and was no longer eligible to serve. As a result, appellant was properly penalized by indefinite suspension even under a literal meaning of the phrase "majority of the membership" which he urges upon this court since the "membership" consisted of seven members and four voted to suspend.

7. We note that even if traditional standards of contract interpretation were rigorously applied in an academic context, which *Basch v. George Washington University, supra* at 1368–69, and *Greene v. Howard University, supra,* 134 U.S. App.D.C. at 88, 412 F.2d at 1135, suggest

should not be the case, we would then be required to focus on the meaning that Howard University would reasonably expect appellant to give to the Code sections defining the composition of the Boards. *Giles v. Howard University,* 428 F.Supp. 603, 605 (D.D.C.1977); Restatement, Contracts § 227. If a student, at the time of "contracting," entertained any reasonable expectations regarding the operations of the University's disciplinary proceedings, it is likely he anticipated that those proceedings would follow generally accepted and existing procedural patterns.