**Cornelius J. MINIHAN, Plaintiff,**

**v.**

**AMERICAN PHARMACEUTICAL ASSOCIATION, Defendant.**

**Civ. A. No. 85–989.**

United States District Court, District of Columbia.

Dec. 17, 1985.

Alan Banoy, Washington, D.C., for plaintiff.

Michael McConihe, Washington, D.C., for defendant.

## MEMORANDUM

JOHN GARRETT PENN, District Judge.

The case is presently before the Court on defendant's motion for summary judgment and plaintiff's cross motion for partial summary judgment, to consider the existence, conditions and duration of plaintiff's employment contract with defendant. Specifically, the parties move the Court to determine whether the employment contract guaranteed Mr. Minihan a permanent posi-

tion with American Pharmaceutical Association. The complaint alleges that the defendant denied the plaintiff annual leave and terminated him in bad faith. Defendant asserts that all of these issues can be disposed of on its summary judgment motion. After careful consideration of the motion, the opposition thereto and the record in this case, the Court grants defendant's summary judgment on the contract and punitive damages issues and grants summary judgment, sua sponte, for plaintiff on the issue of annual leave.

### I

The facts are as follows. Plaintiff, Cornelius J. Minihan, a specialist in journalism and publications, applied for a position as Director of Publications with the American Pharmaceutical Association. Prior to this, Mr. Minihan was unemployed. Minihan Deposition at 10–12.[1] On March 23, 1982, Dr. William Apple, then defendant's president, interviewed Mr. Minihan and offered him a position as Director of Publications. The letter of employment, which purportedly confirmed the agreement, stated that Mr. Minihan would have "full-time; permanent" employment, at an annual salary of $40,000. Defendant Exhibit 1. The letter and allegedly Dr. Apple's comments referred to the conditions of employment at the Association as set forth in the "American Pharmaceutical Association Personnel Policy Manual (Manual)." Defendant's Exhibits 1 and 2, Minihan at 20. Mr. Minihan believed that "permanent" meant he was guaranteed employment for as long as he satisfactorily performed and he concluded that Dr. Apple's statements "supported this view." Minihan at 24. In late September or early October, Dr. Apple informed Mr. Minihan he intended to dissolve the Publications Division due to budgetary economies and staff reorganization. Although plaintiff was assured that he had performed commendably, his employment

---

1. References to Cornelius Minihan's and Virginia Weschler's depositions will be hereafter cited to as Minihan and Weschler, respectively.

was scheduled to terminate on December 31, 1983. Minihan at 32, 33.

At this same time, a memorandum dated September 28, 1983 notified all personnel of a change in the annual leave policy outlined in the manual. Employees were required to choose either to receive a lump sum payment of any annual leave in excess of 40 hours or have it deposited in a special medical account. Lack of appropriate notification would result in the annual leave automatically charged to the medical account and consequently not accessible upon termination. Defendant Exhibit 5. Mr. Minihan asserts that, in a conversation subsequent to the letter's circulation and after oral notice of termination, Dr. Apple requested that he "stay on as a favor ..." until he could find a comparable job somewhere else. In addition, Dr. Apple allegedly assured plaintiff that arrangements would be made for his annual leave. Minihan at 34.

Dr. Apple died on December 17, 1983. Plaintiff then confirmed in writing his understanding of Dr. Apple's promise for further employment and guaranteed annual leave. Defendant's Exhibit 9. After Dr. Apple's death, his successor Maurice Q. Bectel, advised Mr. Minihan, in a letter dated December 30, 1983, that he intended to pursue Dr. Apple's original plan for reorganization. As a result, Mr. Minihan would be terminated on December 31, 1983 and paid an additional two weeks salary without any work obligation. Defendant's Exhibit 10.

It is uncontested that Mr. Minihan performed his duties adequately. The focus of the dispute is whether the defendant could, by the terms of the employment agreement, terminate Mr. Minihan "without cause". Plaintiff contends that the employment contract guaranteed him a position unless he performed unsatisfactorily. Minihan Complaint ¶ 6.[2]

II

Both parties agree that for the purposes of this motion, the Manual merges with the employment letter to form the employment agreement. In addition, it is uncontested that Dr. Apple, as president of the Association, offered Mr. Minihan "full-time; permanent" employment. Plaintiff's evidence, primarily consisting of Ms. Weschler's and his deposition, is in substantial agreement with the defendant's. Plaintiff, avers that Dr. Apple made statements from which plaintiff understood the term "permanent" to mean he would continue employment with the defendant as long as he performed his job satisfactorily. *See* Plaintiff's Statement of Material Facts About Which There Is No Genuine Dispute, ¶ 7. This conclusion or belief, however, does not evince Dr. Apple's intent.[3] More than a plaintiff's belief in the permanence of employment is necessary to raise a material issue of fact. *Sullivan v. Heritage Foundation,* 399 A.2d 856, 859 (D.C.1979). After careful reading of the evidence, the Court concludes that there are no genuine issues of material fact and therefore, the summary judgment motion turns upon the applicable substantive law.

III

In employment situations, though the classic legal assumption is that the parties intend a contract of indefinite term, to be terminated at will, it is clear that parties may contract otherwise. The dispositive element is the parties' intent. *Hodge v. Evans Financial Corp.,* 707 F.2d 1566, 1568 (D.C.Cir.1983). To deduce the parties' intent the Court must consider the express terms of the contract, the circumstances surrounding its making and the consideration furnished. *Id.* at 1569.

In this case the express terms of the Manual and the employment latter categorize plaintiff's position as "full-time perma-

---

2. Count II of plaintiff's complaint claims a violation of the District of Columbia's Wage Payment Law which plaintiff later abandoned.

3. Plaintiff offers no evidence of exactly what Dr. Apple said except that Dr. Apple specifically mentioned staff members whom he had worked with for many years. Minihan pp. 14–15.

nent". The Manual defines full-time as "an employee hired to work the Association's normal work week on an ongoing basis until the employment is terminated by either the employee or the Association". Defendant Exhibit 2, Section 201.1. The converse category, part-time, is defined as "an employee hired to work less than the Association's normal work week on an ongoing basis until employment is terminated by either the employee or the Association." Defendant's Exhibit 2, Section 201.2. A temporary employee "is either a full-time or part-time employee hired *other than on an ongoing basis,* usually for a predetermined period of time or for the completion of a particular project." Defendant's Exhibit 2, Section 201.3 (emphasis the Court's). Although the term permanent is not explicitly defined in the Manual, in its common usage the term infers an ongoing, continuous or non-temporary state. The question is whether the term permanent in the employment letter can be construed to represent anything more than the usual business contract for continuing employment, terminable at will by either party. After analyzing the relevant case law, the Court concludes that the ordinary construction is mandated.

In the context of an oral agreement, the Court of Appeals in *Littell v. Evening Star Newspaper Co.,* 120 F.2d 36 (D.C.Cir.1941), reasoned that in the absence of clearly expressed intent, the "assumption will be that even though [the parties] speak in terms of 'permanent' employment the parties have in mind merely the ordinary business contract", terminable at the will of either party. *Id.* at 37. Plaintiff urges this Court to conclude that because the word permanent is undefined in the Manual, its presence in the employment letter intimates a special meaning. Contracts are to be read by reference to the norms of conduct and common usages surrounding similar contracts. *Greene v. Howard University,* 412 F.2d 1128, 1135 (D.C.Cir.1969); *Howard University v. Best,* 484 A.2d 958,

967 (D.C.1984). Employment contracts for life are by their binding nature unusual contracts and logically not envisioned as ordinary business practice. *Smith v. Beloit Corp.,* 40 Wis.2d 550, 162 N.W.2d 585, 587 (1968).[4] Recently, the Court of Appeals classified a contract that promised employment until retirement and termination only for good cause, as "extremely unusual, almost inexplicable as a matter of business practice". *Albert Z. Hodge v. Evans Financial Corporation,* 778 F.2d 794, 803 (D.C.Cir.1985). Logically, a contract for life constitutes a similar anomaly in the business world. The Court further explained that a contract terminable at will is the usual business understanding of the term permanent employment. A contract, however, could constitute permanent in the sense of terminable only for cause. *Id.* at 801.

Defendant argues that the agreement reflects an ordinary, terminable at will contract. The Court cannot entirely agree, because the Manual outlines conditions of termination, and therefore it does not evince a "pure at will" contract. Some of the applicable sections are summarized as follows; (1) After the three month probationary period all full-time employees must receive or give at least one week notice of termination, (2) the Association may opt for severance pay in lieu of notification. [Defendant's Exhibit 2, Section 206.2.] (3) Part-time and temporary employees may be terminated or may leave without either notice or severance pay. [Defendant's Exhibit 2, Section 206.3]; and (4) when the Association terminates "for cause" it does so pursuant to the reasons listed in Section 206.8. In this case, an employee is not entitled to notice or severance pay. It is clear that these provisions contractually mandate notification procedures but there is nothing which expressly limits termination only "for cause".

Plaintiff contends that because the Manual does not specifically articulate other

---

**4.** Exhibits 1A—1P, Defendant's Supplemental Responses to Plaintiff's Discovery Requests, are Association employment letters issued in num-

erous hiring situations. Each one states the term, "full-time; permanent".

reasons for termination except those listed "for cause", no additional reasons were envisioned. This interpretation confounds the obvious. Where procedures and time tables for notification are clearly set forth, and termination "for cause" requires no notification, the parties must have considered additional termination reasons. In fact, the Manual refers to termination due to lack of work or reduction in forces under another section entitled Equal Employment Opportunity Policy. Defendant's Exhibit 2; Section 1:100.5. Nothing in the employment papers reflect an unusual interpretation of the term "permanent", therefore the Court must consider other factors which may help infer the parties' intent.

Although consideration is not necessary for a permanent contract, which guarantees employment for so long as an employee performs satisfactorily, it is a strong indication of the parties intent. *Littell v. Evening Star Newspaper Co.*, 120 F.2d 36, 37 (D.C.Cir.1941). When parties suffer some detriment in exchange for acceptance of a permanent employment position, the logical inference is that the parties could not have contemplated summary discharge without liability. *Riefkin v. E.I. DuPont de Nemours & Co.*, 290 F. 286, 289 (D.C. Cir.1923). In this case, Mr. Minihan was unemployed before he accepted Dr. Apple's offer. There is no evidence of consideration or circumstances which might infer a guarantee by Dr. Apple, for life-time employment.[5]

The Court concludes that the parties, by their actions and terms of agreement, did not intend to guarantee life-time employment. Therefore, the contract, as a matter of law will be construed as terminable at will by either party, modified only, but the notification requirements set forth in the Manual. *Hodge*, 707 F.2d at 1570.

### IV

■ On the issue of punitive damages, the plaintiff offers a paucity of evidence to support such a claim. Although a plaintiff may sue on alternate theories of tort or contract, to recover, the evidence must support a willful, outrageous, evil, malicious or deliberately oppressive act. *Mariner Water Renaturalizer of Washington, Inc. v. Aqua Purification*, 665 F.2d 1066, 1071 (D.C.Cir.1981). Under the law of the District of Columbia, such damages are disfavored. *Id.* In light of the Court's determination that the contract was basically terminable at will, the plaintiff's evidence is not sufficient to support a finding or an inference of a deliberately wrongful or malicious act by defendants. *See H & R Block, Inc. v. Testerman*, 275 Md. 36, 338 A.2d 48 (1975).

### V

■ Finally, Mr. Minihan claims he was denied annual leave. Defendant does not dispute that plaintiff, in fact, had accrued more than 40 hours of annual leave, instead defendant asserts its right to act in accord with established policies. In a memorandum dated September 28, 1983, Association personnel were notified of a change in the annual leave policy. Defendant urges the Court to rely solely on the procedure set forth in that memorandum and dismiss the plaintiff's claim because he failed to properly follow the procedures. A company, however, follows established business customs which recognize the apparent, actual or implied authority of business officers to manage the ordinary corporate affairs. *See* 19 Am.Jur.2d, Corporations, 1169, 1170 (1985). Mr. Minihan alleges that Dr. Apple specifically told him he would make arrangements for his annual leave. In reliance on this promise, the plaintiff took no further action. The Association does not dispute the plaintiff's factual contention and is now estopped to argue improper procedure, since Dr. Apple, as president, had the apparent and implied authority to create special arrangements for employees in salary matters.

---

**5.** Both Mr. Minihan and Ms. Weschler agree that Dr. Apple, in fact, intended to terminate Mr. Minihan, with no apparent hesitation, except to express his concern that he was sorry it had to happen. Minihan p. 31, Weschler, p. 72.

The plaintiff is entitled to judgment on this claim.

An appropriate order has been issued.

## ORDER

This comes before the Court on defendant's motion for summary judgment and plaintiff's cross motion for partial summary judgment. After giving careful consideration to the motions, the oppositions thereto and the record in this case, the Court concludes that plaintiff's motion for partial summary judgment must be denied, and that defendant's motion for summary judgment must be granted, except with respect to the issue of annual leave. The Court further concludes that the plaintiff is entitled to judgment on the issue of annual leave and judgment is awarded *sua sponte*. A memorandum setting forth the reasons for the Court's determination accompanies this order.

In view of the above, it is hereby

ORDERED that plaintiff's motion for partial summary judgment is denied, and it is further

ORDERED that defendant's motion for summary judgment is granted, except to the extent that it addresses the issue of annual leave, and it is further

ORDERED that the defendant shall pay to the plaintiff the amounts due to the plaintiff for accrued annual leave as set forth in the accompanying memorandum, and it is further

ORDERED that each party will bear its own costs.