**Susan G. SCHWARTZ, Plaintiff,**

v.

**PARALYZED VETERANS OF AMERICA, Defendant.**

**Civil Action No. 95–0409 (JR).**

United States District Court, District of Columbia.

Feb. 1, 1996.

Woodley B. Osborne, Osborne & Deutsch, Washington, DC, for Plaintiff.

Dannie Beale Fogleman, Coleman, Coxson, Penello, Fogelman & Cowen, Washington, DC, for Defendant.

### MEMORANDUM

ROBERTSON, District Judge.

This case proceeded to trial before a jury on Susan Schwartz's claim that the termination of her employment by Paralyzed Veterans of America (i) was unlawful sex discrimination under Title VII of the Civil Rights Act of 1964 and the District of Columbia Human Rights Act (DCHRA) and (ii) breached a contract of employment established by provisions of PVA's Personnel Policies and Procedures Manual. After plaintiff rested, defendant moved for judgment as a matter of law pursuant to F.R.Civ.P. 50(a). I granted the motion, ruling from the bench

(i) that the PVA Manual was not a contract and (ii) that plaintiff had failed to establish a prima facie case of sex discrimination. This memorandum sets forth the reasons for my decision.

### Facts

Plaintiff Susan Schwartz applied for the position of media relations manager at PVA in December 1992. She read and signed a statement printed on the application that any employment relationship with PVA would be of an "at will" nature, which was explained (on the application form) to mean, among other things, that "the employer may discharge employee at any time with or without cause." She was offered the job in January 1993 and began work in February 1993. Her supervisor was Phillip Rabin, director of communications. His supervisor was John Bollinger, deputy executive director.

In April 1993, Mr. Bollinger complimented plaintiff for her work on a media tour in Florida. In the same month, Mr. Rabin evaluated her overall performance as "superior" (in a four step ranking of unsatisfactory, acceptable, superior and exceptional). In September 1993 her overall job performance was rated "superior" (in a five step ladder: unsatisfactory, acceptable, fully competent, superior, exceptional). Her next performance evaluation, in April 1994, was "fully meets" [job requirements] (the steps were unsatisfactory, minimally meets, fully meets, consistently exceeds and far exceeds). The language describing the "fully meets" category, on the evaluation form, was, "Performance fully meets and sometimes exceeds job requirements. Individual skills, initiative and judgement are being used appropriately." In this April 1994 evaluation Mr. Rabin wrote:

"Susan continues to be an industrious employee. However, she seems to have reached a plateau at which she is comfortable. She must become less passive and more pro-active both internally and externally. As Media Relations Manager she must become more imaginative in telling PVA's story to the media and other key audiences."

As goals for plaintiff's future performance, he wrote:

"1. Become less passive and more pro-active both externally and internally in telling PVA's story.

"2. Become more proficient in a wider range of communications tools.

"3. Become more independent in handling projects."

Two months later, on June 15, 1994, plaintiff was told, in a meeting attended by Messrs. Bollinger and Rabin, that she was to be replaced as media relations manager because her performance had "plateaued" and that she was not aggressive enough. PVA undertook to consider her for a new position of senior writer, if PVA's board of directors gave approval for the creation of the new position at its August meeting. PVA told plaintiff that if the new position were not approved or not offered to her, she could continue as a PVA employee until the end of the calendar year and that, during the remainder of her employment, she could take liberal leave absences to look for another job. As it turned out, the PVA board of directors did not approve the senior writer position at its August meeting. Plaintiff was released effective December 31, 1994.

Most of the testimony in plaintiff's case-in-chief focused on her contention that she had in fact done a good job as media relations manager. She contended that she had achieved good publicity for the 1994 wheelchair games in Kansas City. Messrs. Bollinger and Rabin, called as witnesses in plaintiff's case, testified that plaintiff had done well on the wheelchair games but that she had not performed well enough in other aspects of her job, including finding newsworthy material within PVA and disseminating it to the media.

While she was employed at PVA, plaintiff became pregnant and then suffered a miscarriage. She testified that she became aware of her pregnancy in February 1994, that her pregnancy was at risk, that she experienced bleeding and had to be out of work for one and one-half weeks early in her pregnancy, and that, in mid- to late-March 1994, her doctor advised her against travel. On May 3, 1994, her doctor informed her that the fetus was dead. A surgical procedure was performed the next day, and Ms. Schwartz was out of work for several days thereafter. Nevertheless she went back to work, finding work a "good alternative to sitting around the house and crying." Plaintiff testified that Mr. Rabin was sympathetic but that, several days after she returned to work, he asked how she was doing, she answered, "Not good," and he said to her "So, still feeling some lingering effects, are we?" It was apparent from plaintiff's testimony that she found the remark, and the tone of voice in which it was made, insensitive. About a month after that episode she was told by Messrs. Bollinger and Rabin that she would be replaced as media relations manager.

Plaintiff's predecessor as media relations manager was a woman. Her predecessor's predecessor was a woman. Her successor was a woman. Other women employed at PVA became pregnant, bore children, and suffered miscarriages without adverse employment actions.

The PVA Personnel Policies and Procedures Manual contains a number of sections and provisions upon which plaintiff relies:

· As a matter of policy, terminations will be "predicated in large part" upon periodic performance evaluations and reviews. Plaintiff's Exhibit 6, p. 57.

· The Executive Director is to make final determinations of employee performance and "take such action as is merited by that performance." *Id.*

· "A regular employee whose job performance is found to be deficient may be placed on probationary status. Placement on probationary status may result in jeopardizing the employee's continued employment unless immediate improvement in the deficient areas occurs." *Id.,* p. 58.

· It is PVA's "intent to provide continuous employment to all salaried employees. However, conditions may arise which necessitate the dismissal of an employee . . . ." *Id.,* p. 63.

· Severance pay is discretionary with the Executive Director, not to exceed two weeks. *Id.,* p. 64.

· Separations are by resignation, release, or termination—all defined terms. A

"release" is an involuntary "permanent separation initiated by the organization due to lack of work or the employee's inability to perform satisfactorily the duties of his/her position." *Id.*, p. 63.

The Manual also contains the following language, on the first page:

"This handbook is not a contract guaranteeing employment for any specific duration.

"Please understand that no supervisor, manager, or representative of PVA other than the President or Executive Director has the authority to enter into any agreement with you for employment for any specified period or to make any promises or commitments contrary to the foregoing."

Plaintiff elicited from PVA in discovery, and published to the jury in chart form, a list of all employees of PVA's national office who were terminated involuntarily between January 1, 1990, and December 31, 1994, showing their last overall performance evaluations and the reasons for their termination as reflected in PVA's personnel records. Plaintiff contended on the basis of that information that she was the only employee terminated involuntarily for reasons of unsatisfactory job performance (rather than "for cause," such as bad conduct or absenteeism) whose last evaluation before termination was "fully meets." The uncontradicted testimony of PVA's human resources manager Colleen Larsen was, however, that Allison Patterson was fired for performance reasons although she had been rated "superior," and that Stacy Reiners was terminated for inadequate performance of job duties although she had been rated "superior."

### Breach of Contract Claim

■ I granted the defendant's motion for judgment as a matter of law on plaintiff's breach of contract claim because I concluded that plaintiff had no contract with PVA that prohibited her termination.

■ Under District of Columbia law, an employment manual may constitute a contract of employment. See *Greene v. Howard University*, 412 F.2d 1128 (D.C.Cir.1969). *Greene* involved facts significantly different from the facts of this case, however. The employment handbook in *Greene* contained language requiring notice and a hearing if a professor's contract was not to be renewed. A number of employed professors had relied to their detriment on the absence of notice, declining other offers of employment. Howard had a clear and consistent practice of giving notice before non-renewal. 412 F.2d at 1132–34. None of those facts are present on this record. The language of PVA Manual is permissive rather than mandatory. The element of reliance, which was central to the *Greene* case, is totally absent here; plaintiff never read the manual. And Plaintiff's Exhibit 37, the only evidence of record that even arguably supports plaintiff's contention that PVA had a clear and consistent practice of continuing employment for persons evaluated as "fully meets," was neutralized, without the need to evaluate witness credibility, by Colleen Larsen's testimony that other employees had been terminated for performance reasons although they had been rated "superior."

■ If an employment manual is "reasonably susceptible" to the interpretation for which plaintiff contends, or if the record discloses a factual issue as to customs and practices of an employer, the question of whether a contract exists is one for the jury. See *Bason v. American University*, 414 A.2d 522, 525 (D.C.1980). The threshold determination of "reasonable susceptibility," however, is one for the court. *Washington Metropolitan Area Transit Authority v. Mergentime Corp.*, 626 F.2d 959, 961 (D.C.Cir.1980); see *Dixon v. Wilson*, 192 A.2d 289, 291 (D.C.1963).

I find as a matter of law that PVA's Manual is not "reasonably susceptible" of interpretation as a contract protecting plaintiff from termination for performance reasons after receiving a "fully meets" evaluation, and that no genuine issue of fact as to PVA's customs and practices is raised on this record.

■ I find moreover that PVA effectively preserved its position that plaintiff was an employee at will by obtaining her written acknowledgment at the time of her application and by including a prominent disclaimer

at the front of the Manual. *See Goos v. National Association of Realtors,* 715 F.Supp. 2, 4–5 (D.D.C.1989).

### Claim of Sex Discrimination

 I granted the defendant's motion for judgment as a matter of law on plaintiff's claim of sex discrimination because I found that plaintiff had not established the prima facie case required by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973): [1]

> "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

The Supreme Court noted, in a footnote inserted at this point, that

> "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."

The most recent controlling Title VII cases, *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), and *Barbour v. Merrill,* 48 F.3d 1270 (D.C.Cir.1995), provide guidance on the question of what a prima facie case must be, even though neither case addressed the issue directly. *Hicks* and *Barbour* wrestled with the relationship between the second and third prongs of the *McDonnell Douglas* test that are applied *after* the prima facie case: the nondiscriminatory reason given by the employer for its action, and the opportunity given to the plaintiff to demonstrate that the reason given was pretextual.

In *Hicks,* 509 U.S. at 515–17, 113 S.Ct. at 2752, the Supreme Court concluded that a fact finder's rejection of an employer's reason as pretextual is necessary to a finding of liability but not sufficient, because the fact finder must also be able reasonably to find that the rejected reason was a pretext *for discrimination. Hicks,* 509 U.S. at 515–17, 113 S.Ct. at 2752. In *Barbour,* 48 F.3d at 1270, our Court of Appeals, following *Hicks,* observed that

> "a fact finder's rejection of the employer's nondiscriminatory reasons, while not sufficient to *compel* a finding of discrimination, nonetheless suffices to *permit* such a finding.... According to *Hicks,* a plaintiff need only establish a prima facie case and introduce evidence sufficient to discredit the defendant's proffered nondiscriminatory reasons; at that point, the fact finder, if so persuaded, may infer discrimination."

The lesson of *Barbour* and of *Hicks* is that discrimination cannot be found by speculation but must be inferred from a solid evidentiary base. The *Barbour* opinion permits the inference, but not without proof of discrimination somewhere in the case. In *Barbour* (as in *Hicks*) the proof of the necessary element of discrimination was in plaintiff's prima facie case—which, of course, had to be a prima facie case *of discrimination, see McDonnell Douglas,* 411 U.S. at 801–03, 93 S.Ct. at 1824, quoted *supra.* Thus, in *Barbour,* the prima facie case was (i) that plaintiff was black, (ii) that the jury reasonably could have concluded that he was qualified, (iii) that he was not selected for the position for which he applied, and (iv) that the white man who got the job lacked educational prerequisites the employer had originally described as required for the job, 48 F.3d at 1276. And in *Hicks,* the prima facie case was (i) that plaintiff was black, (ii) that he was qualified for the position of shift commander (at a halfway house), (iii) that he was demoted and ultimately discharged, and (iv) that the position remained open and was ultimately filled by a white man, 509 U.S. at 506–08, 113 S.Ct. at 2747.

---

1. The legal analysis of plaintiff's claim under DCHRA is governed by *McDonnell Douglas. See*

*Thompson v. International Ass'n of Machinists,* 614 F.Supp. 1002, 1011 (D.D.C.1985).

Here plaintiff established in her case-in-chief: (i) that she is a woman, (ii) that she was qualified for her job (PVA's "fully meets" evaluation may not create a contractual right of employment, but the jury reasonably could have concluded from it that she was qualified), (iii) that she was released as PVA's media relations manager, and (iv) that the position remained open and was filled. In this case however—unlike both *Hicks* and *Barbour*, where plaintiffs were black and lost their jobs to whites—the plaintiff, a woman, was replaced by another woman.

The Supreme Court "has not directly addressed the question whether the personal characteristics of someone chosen to replace a Title VII plaintiff are material," *Hicks*, 509 U.S. at 527 n. 1, 113 S.Ct. at 2758 n. 1 (dissenting opinion of Justice Souter).[2] In this case, the fact that Susan Schwartz was replaced by another woman is clearly material to the question of discrimination. It does not *disprove* discrimination, but it does reveal a hole in plaintiff's prima facie case. Plaintiff might have attempted to plug that hole by adducing proof that PVA hired someone less qualified as her successor, or that PVA treated women and men differently. But the record is silent on the qualifications or abilities of plaintiff's successor, and plaintiff's failed effort to prove that nobody else had ever been terminated for performance reasons after a "fully meets" evaluation did not even begin to establish disparate treatment of women.

 It is possible that the jury in this case might have found pretext in some of the language used by Mr. Bollinger at trial or in meetings at the time of plaintiff's replacement—that she was "passive" or not "aggressive" or that she was "mute" in meetings. But, as the majority pointed out in *Hicks*, such a finding of pretext would not replace the "greater enterprise of proving that the real reason was intentional discrimination." *Hicks*, 509 U.S. at 517, 113 S.Ct. at 2752.[3]

 Nor does the temporal relationship between plaintiff's pregnancy and miscarriage and PVA's decision to replace her give rise to an inference of discrimination that would fill the void in her prima facie case. Plaintiff conceded in her trial testimony that her temporary inability to travel and her need for time off after her miscarriage were treated sympathetically and correctly by PVA. She was not pregnant in June 1994, when PVA decided to replace her as media relations manager, or in December 1994, when she was released. She withdrew before trial her claims based on the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12111 *et seq.*, the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, and the District of Columbia Family and Medical leave Act of 1990, D.C.Code tit. 36, ch. 13 (1991 Supp.).

---

2. In *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir. 1981), a refusal to promote case, the characteristics of persons who were promoted were held to be an element of a prima facie case. *Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 155 (1st Cir.1990), a pregnancy termination case, is to the contrary, but the appellate opinion reveals that ample evidence of discrimination was received during the trial.

3. The use of labels like "passive" and "does not speak up in meetings" may reveal something about the speaker, but it is not clear what. *See* Mary Anne C. Case, *Disaggregating Gender from Sex and Sexual Orientation: The Effeminate Man in the Law and Feminist Jurisprudence*, 105 Yale L.J. 1, 79 (1995). A few words of that nature, without more, such as proof of the use by that speaker of different labels for men, will not in any case give rise to an inference of intentional sex discrimination.